Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION

JOSE HERNANDEZ and PRISCILLA HERNANDEZ
Plaintiffs

vs.        CASE NO. 7:13-CV-91(HL)

CROWN EQUIPMENT CORPORATION
Defendant

ORAL DEPOSITION OF RUSS RASNIC

APPEARANCES:
MR. MICHAEL WARSHAUER, ESQ.
Warshauer Law Group
3350 Riverwood Parkway, Suite 2000
Atlanta, Georgia  30339

*** For the Plaintiffs (Via Telephone) ***

MR.THOMAS J. CULLEN, ESQ.
Goodell, Devries, Leech & Dann
One South Street, 20th Floor
Baltimore, Maryland  21202
*** For the Defendant ***

ALSO PRESENT:  Ogden K. Montgomery

TAKEN BEFORE Jeff Bennett, Certified Court
Reporter, LS Certificate No. 19, Bushman Court
Reporting, 620 West Third Street, Suite 302, Little
Rock, Arkansas 72201 on April 15, 2014 at Bushman Court
Reporting, Little Rock, Arkansas commencing at 9:04 a.m.

Page 2

INDEX
WITNESS SWORN: RUSS RASNIC
                                    Page
Examination by Mr. Cullen            4
        EXHIBITS

| Exhibit 70 | 31 |
| Exhibit 71 | 42 |
| Exhibit 72 | 42 |
| Exhibit 73 | 43 |
| Exhibit 74 | 43 |
| Exhibit 75 | 44 |
| Exhibit 76 | 44 |
| Exhibit 77 | 47 |
| Exhibit 78 | 48 |
| Exhibit 79 | 48 |
| Exhibit 80 | 48 |
| Exhibit 81 | 49 |
| Exhibit 82 | 52 |
| Exhibit 83 | 54 |
| Exhibit 84 | 55 |
| Exhibit 85 | 55 |
| Exhibit 86 | 56 |
| Exhibit 87 | 56 |
| Exhibit 88 | 56 |
| Exhibit 89 | 57 |

Certificate         144
Witness' Signature  145

Page 3

1   ANSWERS AND DEPOSITION OF RUSS RASNIC, a witness
2   produced at the request of Defendant, taken in the above
3   styled and numbered cause on the 15th day of April,
4   2014, before Jeff Bennett, Certified Court Reporter, LS
5   Certificate No. 19, a Notary Public in and for Saline
6   County, Arkansas, taken at the offices of Bushman Court
7   Reporting, 620 West Third Street, Suite 302, Little
8   Rock, Arkansas at 9:04 a.m.
9       S T I P U L A T I O N S
10      IT IS STIPULATED and AGREED by and between the
11  parties through their respective counsel that the
12  deposition of RUSS RASNICmay be taken at the time and
13  place designated pursuant to the Federal Rules of Civil
14  Procedure.
15      RUSS RASNIC
16      The witness hereinbefore named, having been duly
17  cautioned and sworn or affirmed to tell the truth, the
18  whole truth, and nothing but the truth, testified as
19  follows:
20
21
22
23
24
25

Page 4

1           EXAMINATION
2   BY MR. CULLEN:
3   Q.   Good morning, Mr. Rasnic.  How are you?
4   A.   Fine.  How are you?
5   Q.   Just fine.  My name is Tom Cullen.  I represent
6   Crown Equipment Corporation.  And we're here to take
7   your expert deposition today in the case of Jose
8   Hernandez v. Crown Equipment Corporation.
9        Before we go any further, are you prepared to
10  offer your final opinions that you may express if this
11  matter is tried?
12  A.   Based on what I've seen until this point, yes,
13  sir.
14  Q.   At any time today if you have a question, if you
15  do not understand or hear one of my questions, please
16  stop me, and I'll be glad to rephrase or repeat the
17  question.
18  A.   Okay.
19  Q.   If you answer a question, I believe it's fair for
20  all counsel to assume you heard the question, you
21  understand the question, and you feel you can provide a
22  truthful and accurate response.  Do you think that's
23  fair?
24  A.   Yes, sir.
25  Q.   Okay.  Roughly, how many times have you been

Page 5

1   deposed in the past?
2   A.   I don't have an exact count. I'd say between 100
3   and 200 times.
4   Q.   Okay. And when did you first start providing
5   expert services where you may be deposed?
6   A.   I began with Ryan Engineering in 2002. So it
7   would have been sometime that year.
8   Q.   Okay.
9        (Interruption.)
10  BY MR. CULLEN (CONT.):
11  Q.   We had some technical difficulties. We were just
12  getting started. You graduated from the University of
13  Arkansas in 1981?
14  A.   Yes, sir.
15  Q.   What was your major at UA?
16  A.   Mechanical engineering.
17  Q.   And you got a master's there as well?
18  A.   Yes, sir.
19  Q.   Now, I want to go through some of your background
20  before you joined Ryan Engineering. From 1999 to 2002
21  you were the president, CEO and chairman of Halo Spark
22  Plug, Inc.?
23  A.   Yes, sir.
24  Q.   Did you have responsibility for, at that point,
25  designing any machinery, machines, things of that

Page 6

1   nature?
2   A.   Only to the extent that they related to our
3   production. I designed the spark plugs that we
4   manufactured.
5   Q.   Okay.
6   A.   And the system to manufacture them.
7   Q.   Is that company still in operation today?
8   A.   No, sir.
9   Q.   Did it go out-of-business in 2002, when you left?
10  A.   We held on for another four or five years, and
11  then abandoned that probably four or five years ago.
12  Q.   Okay. And before then you worked at Rol-Lift
13  Corporation?
14  A.   Yes, sir.
15  Q.   And where was that?
16  A.   That was here in Little Rock.
17  Q.   What were the primary products that Rol-Lift was
18  responsible for manufacturing and selling?
19  A.   We manufactured pallet jacks, stackers, lift
20  tables, dock equipment, forklift attachments, and later
21  on some other load transfer systems.
22  Q.   Okay. The pallet jacks, were they manual or
23  motorized?
24  A.   Only manual.
25  Q.   Only manual?

Page 7

1   A.   Yes, sir.
2   Q.   Okay.
3   A.   Some of our stackers were motorized.
4   Q.   Okay. Were your stackers ride-on equipment or
5   push-equipment?
6   A.   They were walkie.
7   Q.   Walkie?
8   A.   Yes, sir.
9   Q.   What type of forklift attachments was the company
10  responsible for making and selling?
11  A.   Well, our sister company was Long Reach
12  Manufacturing. And they made all types of forklift
13  attachments. We primarily made the side shifters and
14  fork positioners for Long Reach.
15  Q.   While at Rol-Lift Corporation, did you have any
16  responsibility for product design?
17  A.   I did.
18  Q.   For what products?
19  A.   All of them.
20  Q.   Okay. Did you obtain any patents while at
21  Rol-Lift Corporation?
22  A.   No, sir.
23  Q.   Have you ever obtained any patents?
24  A.   Yes.
25  Q.   In what regard?

Page 8

1   A.   In the spark plug business.
2   Q.   Besides patents relating to spark plugs, have you
3   obtained any patents for any other types of machinery?
4   A.   No, sir. There were some provisional patents
5   that I had. I don't know if you know the process.
6   Q.   A little.
7   A.   To protect your intellectual property, until you
8   do a formal filing. I've had one or two of those that I
9   never proceeded passed the provisional stage.
10  Q.   Okay. And with even with the provisional patents,
11  did any of those involve machinery in the material
12  handling field?
13  A.   No.
14  Q.   But the one patent you obtained -- was it one, by
15  the way?
16  A.   Well, it's in several countries. It's the same --
17  essentially it's the same patent in about 10 different
18  countries.
19  Q.   So the one patent you obtained in different
20  countries was related to a spark plug?
21  A.   The manufacturing method, yes, sir.
22  Q.   The dock equipment that you sold and
23  manufactured at Rol-Lift, what type of equipment are we
24  talking about?
25  A.   Hydraulic dock boards, mechanical dock boards,

Page 9

1  edge of docks, top of docks. are you familiar with those
2  terms?
3  Q.  Yes.
4  A.  Okay.
5  Q.  Okay. Any dock locks or anything such as that?
6  A.  No dock locks.
7  Q.  When you say you were involved in the design of
8  all of these products, what types of work would you do
9  on the design, what was your role?
10  A.  Okay. The primary designs were there when I
11  arrived. I redesigned most of our major product lines.
12  Q.  Okay.
13  A.  And then --
14      (Interruption.)
15  BY MR. CULLEN (CONT.):
16  Q.  Now, I think you were describing some of the
17  design modifications you were involved in regarding dock
18  equipment?
19  A.  Yes, sir.
20  Q.  So pick up there. It may be repetitive somewhat,
21  but give us some idea of what you did?
22  A.  Generally, I redesigned most of our major product
23  lines. And then any time we would have an off-shoot or
24  a special, or an extension of that line, I did those
25  designs, while I was the engineering manager, which was

Page 10

1  about half of my career there. And then I became the
2  operations manager.
3  Q.  And how long were you the engineering manager?
4  A.  About five years, a little under five years, about
5  four and a half.
6  Q.  And how would you describe the difference between
7  being an engineering manager and an operations manager?
8  A.  Engineering was -- well, my duties kept growing as
9  engineering manager. But I was responsible primarily
10  for the design of the products and production support.
11  As operations manager I was responsible for the entire
12  operation of the manufacturing plant.
13  Q.  You also indicated that you manufactured walkie
14  pallet jacks?
15  A.  Walkie -- well, manual pallet jacks.
16  Q.  Manual pallet jacks?
17  A.  Yes.
18  Q.  Okay. Did you make any design modifications on
19  those?
20  A.  I did.
21  Q.  What types of design modifications?
22  A.  Well, there were numerous ones. We initially
23  went -- the industry went to a lower type. We
24  redesigned our products to those. I introduced the
25  four-way entry pallet trucks. Do you know what those

Page 11

1  are?
2  Q.  No.
3  A.  On a standard GMA pallet you have -- there's the
4  primary end that you come in that has a stringer board,
5  but there's also cut-outs in the sides of the stringer
6  boards.
7  Q.  Okay.
8  A.  Much lower in height. And I designed that truck.
9  I designed 9,000 pound trucks. I would say I did the
10  number of special off-shoots of our products were in the
11  hundreds, probably close to a thousand.
12  Q.  And that would be a certain customer wanted a
13  special particular design for their product that was
14  different from the standard design?
15  A.  Correct.
16  Q.  Okay. Would you have to approve all specials?
17  A.  I would.
18  Q.  Did Rol-Lift Corporation make any stand-up rider
19  forklifts?
20  A.  No riders.
21  Q.  Okay.
22  A.  Only the walk-behind motorized forklifts.
23  Q.  Did it make any sit-down traditional forklifts?
24  A.  No.
25  Q.  I take it no riders of any kind, whether you were

Page 12

1  standing or sitting?
2  A.  Correct.
3  Q.  Okay. And from 1987 to 1988 you worked at
4  Chamberlain Group?
5  A.  Yes, sir.
6  Q.  Was Chamberlain Group involved in the manufacture
7  or sale of any material handling equipment?
8  A.  No, sir.
9  Q.  Did Chamberlain Group use any stand-up rider
10  forklifts in its facilities that you know of?
11  A.  Side loaders.
12  Q.  Okay. Were they stand-up operated?
13  A.  Yes, sir. Well, let me think about that. They
14  might have had a high-seat. I don't recall. It's been
15  many years. I think they were stand-up.
16  Q.  Do you know the manufacturer of the side loaders
17  that were used at Chamberlain?
18  A.  I believe they were Raymond.
19  Q.  Okay. Any Crown equipment that you recall at
20  Chamberlain?
21  A.  We had a lot of forklifts. I don't recall any
22  Crowns, but we may have had Crowns.
23  Q.  Would these have been sit-down or stand-up
24  forklifts?
25  A.  Sit-down.

Page 13

1  Q.  Do you recall any stand-up rider forklifts such as
2  involved in the Hernandez case being used at
3  Chamberlain?
4  A.  I do not.
5  Q.  Then before then you worked at TI as a project
6  engineer?
7  A.  Yes, sir.
8  Q.  I take it Texas Instruments was not involved in
9  the design or manufacture of material handling
10  equipment?
11  A.  Well, they did a lot of stuff, but that wasn't one
12  of them, that I was aware of anyway.
13  Q.  Okay.  Are you aware of any stand-up rider
14  forklifts being used at Texas Instruments, that you were
15  aware of in your capacity?
16  A.  I'm sure there were.  I supported seven different
17  manufacturing facilities.  I can't recall specifically
18  the types of material handling equipment they had.
19  Q.  In your role at Texas Instruments, did you have
20  responsibility for purchasing material handling
21  equipment?
22  A.  Yes.
23  Q.  Approving the types of material handling equipment
24  used?
25  A.  No, sir.

Page 14

1  Q.  Do you have a degree in biomechanical engineering?
2  A.  I do not.
3  Q.  Do you hold yourself out as a expert in the field
4  of biomechanical engineering?
5  A.  No, sir.
6  Q.  Have you published any articles regarding, first
7  of all, forklifts in peer reviewed publications?
8  A.  No.
9  Q.  Have you published any articles involving any
10  types of material handling equipment in peer reviewed
11  publications?
12  A.  Not that -- I was responsible for developing
13  standards for lift tables.  Those are peer reviewed and
14  they're published.
15  Q.  Okay.  We'll take away the standards for just a
16  minute.
17  A.  Okay.
18  Q.  Have you published any publications, articles,
19  scientific literature regarding material handling
20  equipment that I could access?
21  A.  Not in that aspect, no, sir.
22  Q.  I take it you were involved in the development and
23  publication of standards involving lifted tables?
24  A.  Yes, sir.
25  Q.  Describe for us what a lift table is?

Page 15

1  A.  Industrial scissor-lift basically is the term.
2  It's a work positioning device used in manufacturing
3  plants.
4  Q.  And were you on a committee that was responsible
5  for developing that standard?
6  A.  Yes.
7  Q.  What was that committee?
8  A.  That was the MH 29.1 Committee of the Material
9  Handling Industry of America.
10  Q.  Are you currently on that committee?
11  A.  I am not.
12  Q.  How long were you on that committee?
13  A.  My entire time at Rol-Lift.  Well, I think I began
14  on '90 or '91, so nine years.
15  Q.  Has the standard changed substantially since you
16  left?
17  A.  I don't think so.  I think it had a couple of
18  revisions.  But I haven't checked what the differences
19  are.
20  Q.  Does this standard also have an ANSI or ASME
21  designation?
22  A.  It does.  ANSI slash MH 29.1.
23  Q.  Okay.
24  A.  There was another one that dealt with tilters,
25  which I believe was MH 30.1.  But I'd have to double

Page 16

1  check to make sure that that's the right number.
2  Q.  Have you been on any other ANSI or ASME committee
3  that promulgates standards for any other types of
4  equipment?
5  A.  I started out on the Loading Dock Equipment
6  Manufacturers Committee that developed the loading dock
7  standard, but I wasn't on that one very long.
8  Q.  Okay.  When you say, not very long, how long?
9  A.  I think a year or two.
10  Q.  Okay.  Would part of your responsibility for
11  the -- on the loading dock committee, have included dock
12  locks, dock boards, things of that nature?
13  A.  Dock boards, yes, sir.
14  Q.  How about dock locks?
15  A.  No, sir.
16  Q.  Okay.
17  A.  Those may have ended up in the standard, but I
18  was -- I was gone before the standard was finalized.
19  Q.  Okay.  Was one of the goals in your promulgation
20  of standards regarding dock equipment, to make docks a
21  safe place where material handling equipment could be
22  used in and around them?
23  A.  I don't remember the gist of our assignment.  I
24  think our primary goal is to get a standard for dock --
25  the dock equipment itself.

1    Q.   Okay.
2    A.   I'm sure it would have had some ancillary safety
3    issues related to equipment on the docks.
4    Q.   And what types of specific dock equipment do you
5    recall being involved in the standard at that time?
6    A.   Primarily the dock boards.
7    Q.   Okay.
8    A.   Or dock levelers I guess is the proper term.
9    Q.   I noted that you're a member of several societies,
10   ASME, ASM?
11   A.   Yes, sir.
12   Q.   Human Factors and Ergonomics Society?
13   A.   Yes, sir.
14   Q.   Have you been an officer or have some title within
15   any of these organizations listed on your C.V.?
16   A.   Arkansas Academy of Mechanical Engineers.  I am
17   the president elect for next year.
18   Q.   Okay.
19   A.   I've served on the board since '07 or '08.
20   Q.   Okay.
21   A.   And that's the only one.
22   Q.   Okay.  The National Safety Council, any titles
23   there?
24   A.   No.
25   Q.   And at the Arkansas Academy of Mechanical

1    Engineering, does it work that you start at a lower
2    title, and every year you tend to move up the chain,
3    secretary to treasurer to vice president to president?
4    A.   No.
5    Q.   No?
6    A.   There are different elected positions.
7    Q.   Are there?
8    A.   Yes, sir.
9    Q.   And what positions have you held within the
10   Arkansas Academy of Mechanical Engineering?
11   A.   President elect and that's it and a board member.
12   I've been in charge of some of the committees.
13   Q.   Any committees that relate to material handling
14   equipment?
15   A.   Not directly, no.
16   Q.   Okay.  Do you know the ANSI/ASME committee that is
17   responsible for promulgating standards regarding lift
18   equipment, powered lift equipment such as stand-up
19   forklifts?
20   A.   Do I know the number of it or do I know --
21   Q.   Yeah.  What is the number?
22   A.   B56.
23   Q.   And have you ever been a member of the B56
24   committee?
25   A.   No, sir.

1    Q.   Have you ever attended any meetings of the B56
2    committee?
3    A.   I don't think so.  Long Reach was a member of the
4    ITA.  And we may have had a representative that attended
5    through that.  But I'm not sure of that.
6    Q.   Have you ever, to your knowledge, corresponded
7    with or communicated with the B56 committee about any
8    design or safety issue?
9    A.   I think so.  But I can't recall that -- I can
10   recall asking for clarifications of things during my
11   career at Rol-Lift.
12   Q.   Okay.
13   A.   I may have even asked them a couple of questions
14   during my career at Ryan Engineering.
15   Q.   Do you recall corresponding with or communicating
16   with B56.1 regarding any of the specific standards that
17   relate to stand-up rider forklifts?
18   A.   I do not.
19   Q.   Long Reach was an affiliate of Rol-Lift?
20   A.   They were our sister company.
21   Q.   Okay.
22   A.   We were owned by Long Reach Holdings, Inc., both
23   of the companies were.
24   Q.   And when you were manager of engineering and
25   operations manager, did you have responsibility for the

1    Long Reach Company as well?
2    A.   Not the company itself.  There were some of the
3    products that we produced for them.
4    Q.   Okay.  Did you ever attend any ITA meetings?
5    A.   I did not.
6    Q.   But you recall that Long Reach was a member of the
7    International Trucking Association?
8    A.   Industrial Truck Association.
9    Q.   Industrial Trucking Association?
10   A.   Right, yes, sir.  Truck only, not trucking.
11   Q.   Sorry.  During your tenure at Rol-Lift, do you
12   recall objecting to having any disagreements with or
13   complaining about any ITA standard, best practice or
14   materials they promulgated?
15   A.   Me personally?
16   Q.   Yes.
17   A.   No.
18   Q.   Okay.  Do you know if your company did, that you
19   recall?
20   A.   I don't know.
21   Q.   What is the business function of Ryan Engineering,
22   is it -- I understand it provides forensic services to
23   counsel?
24   A.   That is one of your business units, yes, sir.
25   Q.   Are there other business units?

Page 21

1   A.   There are.
2   Q.   What are they?
3   A.   There's a structural business unit.  And then
4   there is other engineering outside of litigation, not
5   related to structural, which is primarily mechanical or
6   electrical, sometimes some civil.  It depends on what
7   our expertise availability is.
8   Q.   And how is the company broken down just by say
9   revenue?  I don't need to know the revenue.  But is the
10  revenue largely coming from structural engineering
11  projects, forensic services, or is it a mix?
12  A.   The structural is the largest generator of income.
13  Q.   Okay.
14  A.   And then forensics would be second.  And anything
15  else actually probably that's non-structural related
16  would come under the umbrella of the forensics division.
17  Q.   And is it overwhelmingly structural or is it
18  60/40?
19  A.   Let's see.  I haven't ever -- it's probably 70/30
20  or 60/40.
21  Q.   In your tenure at Ryan Engineering, which I
22  believe started in 2002?
23  A.   Yes, sir.
24  Q.   Have you been in both capacities, structural and
25  forensic, or have you stayed on one side?

Page 22

1   A.   I've been mechanical.  I've never -- I have done
2   some support projects for the structural side that
3   related to mechanical engineering issues.
4   Q.   Okay.
5   A.   But I have -- well, when I first joined it was all
6   one company.  And then we kind of segregated the
7   divisions to track the revenue better.
8   Q.   And I take it now you're on the forensic side?
9   A.   Yeah.  We actually spun off the forensic division
10  into a separate company.
11  Q.   And how long have you been with the forensic
12  separate company?
13  A.   Well, the separate company was spun off about
14  three years ago.  I've always been part of the --
15  probably from after a year I've been associated
16  primarily with the forensic division.
17  Q.   Okay.  So since 2003, roughly?
18  A.   Roughly, yes, sir.
19  Q.   You have been affiliated on the forensic side of
20  Ryan Engineering, and then later it became a separate
21  company?
22  A.   That's correct.
23  Q.   And during your time doing forensic work, would
24  you also at times provide mechanical engineering
25  services to the structural group?

Page 23

1   A.   Yes, sir.
2   Q.   Would that be a large percentage of your time or
3   just an occasional project?
4   A.   It depends on the year.  Generally it's a smaller
5   percentage.
6   Q.   Okay.
7   A.   The last year it was probably 20 percent of our
8   business was related to non-litigation related
9   engineering projects.
10  Q.   And I take it that's a high number, if you looked
11  it up the last 10 years, would that be a --
12  A.   Not over the last ten years, probably over the
13  last five years.  Back when we were all under one
14  company, we did a lot -- we had a lot more divisions
15  related to the types of products we did, and the types
16  of services we offered than we do now.
17  Q.   In 2014 what do you expect your split to be, would
18  it been 90 percent forensic, 10, would it be 80/20
19  again?
20  A.   I'd say 80/20 would be a pretty good estimate.
21  Q.   Okay.
22  A.   It depends on how our bids go.  We have a lot of
23  bids out there for machine guard projects that are not
24  related to litigation.
25  Q.   Are you still involved in any design projects?

Page 24

1   A.   As they relate to guarding, I would be, yes, sir.
2   Q.   Okay.  From talking to several engineers,
3   sometimes in this capacity, sometimes just casually,
4   they tend to have areas or types of machines that they
5   have focused on or have niched expertise in.
6   A.   Right.
7   Q.   How would you describe your experience in terms of
8   are there certain types of machines or issues where you
9   feel you have demonstrated tremendous expertise?
10  A.   I have a lot of experience with a broad range of
11  machinery, because I ran the manufacturing plants.
12  Q.   Okay.
13  A.   I ran two different manufacturing plants.  And I
14  have a lot of knowledge of material handling and heavy
15  machinery equipment.  And I do a lot of ATV accidents as
16  well for some reason.
17  Q.   Okay.
18  A.   My expertise is in general mechanical engineering.
19  My 20 years in industry and prior to doing this type of
20  work has been a pretty broad range of experience with
21  lots of different types of mechanical machinery.
22  Q.   Okay.
23  A.   And, in fact, a lot of electrical experience as
24  well.
25  Q.   I want to be specific regarding stand-up rider

Page 25

1  forklifts.
2  A.   Okay.
3  Q.   Have you ever run a manufacturing facility where
4  stand-up rider forklifts were used to transport
5  materials?
6  A.   I have not managed a facility that had those, no,
7  sir.
8  Q.   Have you ever personally been trained in the
9  operation of stand-up rider forklifts?
10  A.   I'm a trainer, certified trainer of all type
11  manner of forklifts.  And I have operated different
12  ones.
13  Q.   Okay.
14  A.   I don't know if I've formally been trained.  I've
15  been trained to be a trainer on all types of forklifts.
16  Q.   And where did you receive that training?
17  A.   That was here in Little Rock through a material
18  handling dealer.
19  Q.   Which dealer?
20  A.   Hugg and Hall.
21  Q.   And that includes sit-down.  Did it include
22  riders?
23  A.   Yes.
24  Q.   Rider pallet jacks?
25  A.   Yes.

Page 26

1  Q.   Stock pickers?
2  A.   Yes.
3  Q.   And why did you obtain that certification?
4  A.   Well, I obtained it to train our company because
5  we had forklifts.
6  Q.   Okay.
7  A.   And then I've used it from time-to-time to train
8  others.
9  Q.   Have you ever trained any individual in the
10  operation of a stand-up rider forklift?
11  A.   Stand-up rider, no.
12  Q.   Did you operate stand-up rider forklifts while in
13  your training program at Hugg and Hall?
14  A.   At Hugg and Hall, no, I did not.
15  Q.   Have you ever operated, to your knowledge, a
16  stand-up rider forklift?
17  A.   In a production capacity or at all?
18  Q.   First of all, in a production capacity.
19  A.   No.
20  Q.   And second, I'll broaden it.  Have you ever
21  operated a stand-up rider forklift in either a forensic,
22  I can't imagine you did it just for fun?
23  A.   Right.
24  Q.   Okay.
25  A.   I have operated several.

Page 27

1  Q.   Okay.
2  A.   And several different manufacturers' devices.
3  Q.   Have you ever operated a Crown stand-up rider
4  forklift?
5  A.   I have.
6  Q.   Before your involvement in this case, have you
7  ever operated a Crown stand-up rider forklift?
8  A.   I think so.
9  Q.   Okay.
10  A.   I'm trying to think back of all the riders I've
11  operated.  I may have operated a Crown, but I'm not --
12  I'm not certain on that.
13  Q.   Okay.  And you can't give us any details if you
14  did?
15  A.   No, sir.  If it comes to me I'll let you know.
16  Q.   If you did, would it have been in connection with
17  a lawsuit?
18  A.   Yes, sir.
19  Q.   Okay.  And in looking at your -- at least your
20  last four years of testimony, I didn't see any Crown
21  cases besides this case?
22  A.   Correct.
23  Q.   So it would have been prior to that, if it did
24  occur?
25  A.   Yes, sir.

Page 28

1  Q.   Okay.  Do you recall which other manufacturers of
2  stand-up rider forklifts that you operated their
3  equipment?
4  A.   Clark and Raymond, several Raymonds, different
5  styles of Raymond stand-up riders, Prime Mover.  There's
6  another one.
7  Q.   Caterpillar?
8  A.   Not Caterpillar.
9  Q.   Toyota?
10  A.   I think it might have been a Toyota, yeah.
11  Q.   Okay.  If you had to quantify the amount of time
12  you've spent on a stand-up rider, would it be less than
13  a couple of hours?
14  A.   Probably be a day total.
15  Q.   At any company you've worked with, have you ever
16  been tasked with purchasing or making decisions
17  regarding the types of stand-up rider forklifts to
18  purchase?
19  A.   The Raymond side loader, but not a stand-up rider
20  per se like you're talking about.
21  Q.   Okay.
22  A.   And you're talking only stand-up riders, not
23  sit-down, right?
24  Q.   Correct.
25  A.   Okay.  Now, when you talk about a stand-up rider,

Page 29

1  let me qualify that, clarify that. You're not talking
2  about any type of a rider stand-up, like a pallet jack,
3  for instance?
4  Q.  Correct. The stand-up rider I'm referring to as a
5  forklift such as the Crown 5000 or 5200 series truck.
6  A.  Okay.
7  Q.  If I talk about pallet jacks, I'll say rider
8  pallet jacks.
9  A.  Thank you.
10  Q.  Okay. Have you ever purchased rider pallet trucks
11  in a manufacturing facility that you operated or
12  managed?
13  A.  I have one in my facility that I bought.
14  Q.  Okay. What's the manufacturer?
15  A.  Crown.
16  Q.  Do you know if it's a 4000 series or --
17  A.  It's an old resistor controlled pallet jack. I'm
18  trying to remember the model number. I haven't looked
19  at it in a while. I have to find that for you.
20  Q.  And what do you use it for?
21  A.  Transporting materials around my shop.
22  Q.  Okay. Any dock work at your shop?
23  A.  I do have a loading dock, yes, sir.
24  Q.  Do you occasionally use the pallet truck to -- the
25  rider pallet truck to load and unload tractor-trailers?

Page 30

1  A.  If they're not too low, yes, sir.
2  Q.  Is this the type of pallet truck with just a
3  platform on the rear of the truck?
4  A.  Yes, sir.
5  Q.  With a handle that can be raised and turned?
6  A.  Correct.
7  Q.  Okay. And any accidents or injuries that you can
8  recall with the Crown PE?
9  A.  No, sir.
10  Q.  Have you ever designed a stand-up rider truck such
11  as the Crown 5000 series or Raymond, some of the
12  stand-up riders you've operated?
13  A.  I have not.
14  Q.  Have you ever designed any component part of a
15  stand-up rider forklift?
16  A.  You're talking about for a manufacturer of one?
17  Q.  Yes.
18  A.  Not that I remember.
19  Q.  Have you ever worked for any company that designs,
20  builds or manufacturers stand-up riders?
21  A.  No.
22  Q.  Okay.
23  A.  Back to your last question. We from time-to-time
24  at Rol-Lift we built mast systems and cylinders. I'm
25  not sure if they went into -- I'm sure some of them went

Page 31

1  into a forklift manufacturing company products. I'm
2  just not sure which ones.
3  Q.  Okay. As you sit here today, are you aware of any
4  mast system or cylinder system that Rol-Lift designed,
5  that ended up in a stand-up rider forklift made by any
6  manufacturer?
7  A.  I couldn't say one way or the other. I know we
8  made mast and cylinder systems for somebody.
9  Q.  Okay.
10  A.  I'm not sure what kind of product they went on. I
11  should know, but I can't remember who the manufacturer
12  was.
13  Q.  Okay. Now, in your capacity in this case as a
14  forensic engineer, do you have a standard retainer
15  agreement?
16  A.  I do.
17  Q.  Did you bring it with you today?
18  A.  I did.
19  Q.  Your work that you do today in a forensic setting,
20  what is the split between work you do on behalf of
21  claimants or plaintiffs and the work you do on behalf of
22  defendants?
23  A.  It depends on the year, but over the years it's
24  gravitated to mostly plaintiff's work. Probably 80 to
25  90 percent is plaintiff.

Page 32

1  Q.  In a case involving a piece of material handling
2  equipment, forklifts, sit-down and stand-up, some of
3  which I've seen on your C.V, list of cases, have you
4  ever testified for a manufacturer in those cases?
5  A.  Forklifts?
6  Q.  Yes.
7  A.  I have defended Rol-Lift. That was my first one.
8  Q.  Okay.
9  A.  I'm not sure I've been retained by a forklift
10  manufacturer, to my knowledge. I don't recall any.
11  Q.  How many times as a corporate representative or an
12  engineer at Rol-Lift, did you testify on behalf of the
13  company in litigation there?
14  A.  As like a 30(b)(6) rep?
15  Q.  Or just even an engineer, 30(b)(6) or as an
16  engineer just as a fact witness?
17  A.  I'm not sure I could -- it was only twice when I
18  worked for Rol-Lift.
19  Q.  Okay.
20  A.  Exclusive of the -- I was retained by the insured
21  for Rol-Lift after I left them.
22  Q.  Okay.
23  A.  As a consultant. And then became the expert in
24  that case.
25  Q.  Do you recall the products before you left the

Page 33

1  company that you testified in defense of?
2  A.   One was a pallet truck, and one was a manual
3  stacker.
4  Q.   Do you recall the design issues that were raised
5  against the company?
6  A.   In the pallet truck case the pump was broken, and
7  somebody used the pallet truck anyway.  In the stacker
8  case they overloaded it and bent the outriggers.
9  Q.   Heckuva load.
10  A.   Yeah, it was.  It did a lot of damage to the frame
11  as well.
12  Q.   I have a few questions regarding some cases that
13  you presented us in your litigation history.
14  A.   Okay.
15       MR. CULLEN:  Mike, do you recall what we
16  stopped at?
17       MR. WARSHAUER:  I think if you just start
18  at 70 you'll be fine.
19       MR. CULLEN:  Okay.
20       (Deposition Exhibit 70 was marked.)
21  BY MR. CULLEN (CONT.):
22  Q.   I'm going to mark as Exhibit 70 a listing of your
23  litigation history.
24  A.   Okay.
25  Q.   I have one myself here.

Page 34

1  A.   All right.
2  Q.   You can have that one.  I had a few questions
3  regarding the -- and I did have one with some marks on
4  it.
5  A.   It's this one.  Maybe you want to swap.  I don't
6  mind looking at the other copy.
7  Q.   I'll hand you --
8  A.   I have a more current version of that, if you'd
9  like it.
10  Q.   I would actually, yes.
11       (Deposition Exhibit 70 was remarked.)
12  Q.   I'm going to mark this one as Exhibit 70.
13  A.   Okay.  I think it just has one more deposition on
14  there.
15  Q.   I'll give this one back to you so you can look at
16  it.  I'll look at the last one.
17  A.   It involved apparently a material handling device.
18  Q.   That was the Norfolk Southern Railway Company
19  case?
20  A.   Yes, sir.
21  Q.   So I'll hand you what we've marked as Exhibit 70.
22  And I have a few questions about some of these cases.
23  On the first page there's a case where you provided
24  testimony in deposition on 4/27/10, the Brenda Wells V.
25  Skyjack --

Page 35

1  A.   Yes, sir.
2  Q.   Do you recall the machine that was involved in
3  that analysis?
4  A.   That was a scissor-lift.
5  Q.   Did you provide design opinions in that case?
6  A.   I did not.
7  Q.   Was that more of an accident reconstruction?
8  A.   It was a maintenance related issue.
9  Q.   Maintenance?
10  A.   Yes, sir.
11  Q.   The next case involved the Wilkerson case versus
12  Raymond Muscadine, Inc, MHS and Campbell's Express?
13  A.   Yes, sir.
14  Q.   Is that the Raymond that I associate with forklift
15  manufacturing?
16  A.   Yes, sir.
17  Q.   Did you provide design opinions in that case?
18  A.   I found no design defects in that case.
19  Q.   And do you recall the type of forklift that was
20  involved in that case?
21  A.   Center mount rider pallet truck, center mount.
22  Q.   Okay.  So it was a center controlled rider pallet
23  truck?
24  A.   Correct.
25  Q.   Did you provide maintenance opinions regarding MHS

Page 36

1  and other companies?
2  A.   I did.
3  Q.   Do you know if that case ever went to trial?
4  A.   It did.
5  Q.   And you provided testimony there as well?
6  A.   I did.
7  Q.   Do you know the outcome?
8  A.   Verdict for the plaintiff.
9  Q.   Did anyone that you know of, besides yourself,
10  provide design opinions, claiming that the center
11  control rider pallet truck was defective in any way?
12  A.   Not to my knowledge, no.
13  Q.   If you'd turn to the next page.  There's a case in
14  October of 2010, Linda Carter versus Yamaha Motor
15  Corporation.  Did that case involve an ATA?
16  A.   I think I'm missing a page.  Mine goes to the next
17  page is 7/29/11.  Say that again, what date?
18  Q.   10/15/10.
19  A.   Okay.  It's on the same page as this one.
20  Q.   Okay.
21  A.   Linda Carter versus Yamaha.
22  Q.   Was that an ATA case?
23  A.   Yes, sir.
24  Q.   Going down the list.  8/9/11, Sexton versus Nissan
25  Corporation.

Page 37

1  A.  Okay.
2  Q.  Here in Pulaski County?
3  A.  Yes, sir.
4  Q.  What type of machine was involved in your analysis
5  in the Sexton case?
6  A.  Electric sit-down rider.
7  Q.  And did you provide design opinions in that
8  matter, that you recall?
9  A.  I did.
10  Q.  And did you find the sit-down rider to be
11  defective?
12  A.  I did.
13  Q.  In what regards?
14  A.  The seat switch mechanism.
15  Q.  Okay.  Is that like an operator control device,
16  presence control?
17  A.  Presence control, yes, sir.
18  Q.  Do you recall who the defense counsel was in that
19  case?
20  A.  I do not.
21  Q.  Local or --
22  A.  I do not.  I'm sure it was local.  I'm just not
23  sure who it was.
24  Q.  Down that list you have the trial testimony,
25  Wilkerson, we've talked about that?

Page 38

1  A.  Yes, sir.
2  Q.  And in looking, I didn't see other cases that
3  jumped out at me.  But just to ask a broad question.  Do
4  you recall ever providing testimony in a case regarding
5  a stand-up rider forklift, and I have defined it, prior
6  to this action?
7  A.  I have.  Let's see.  Did I get deposed on that
8  one.  To answer your question.  I did not provide any --
9  I didn't find any defect in that case.  It was another
10  maintenance related issue.
11  Q.  Okay.
12  A.  That action involving a Crown RC.
13  Q.  Okay.
14  A.  I don't think I got deposed on that one.
15  Q.  Just so I'm clear.  You provided analysis and
16  expert opinion in a case involving a Crown RC?
17  A.  Yes, sir.
18  Q.  And in regard to the case involving a Crown RC,
19  did you find the Crown RC was defective in any way?
20  A.  I did not.
21  Q.  And you provided testimony regarding the
22  maintenance of that truck?
23  A.  Let me see if I -- I think I actually didn't get
24  deposed in that one.  So I didn't provide any testimony.
25  Issued a report and then it settled.

Page 39

1  Q.  Do you remember the name of the case?
2  A.  Boyle versus -- it was in Philadelphia.
3  Q.  Okay.
4  A.  Or it might have been venued in New Jersey.
5  Q.  Okay.
6  A.  I can't remember who the --
7  Q.  Was it an accident where a Crown RC went off a
8  dock?
9  A.  Yes, it was.
10  Q.  Did you find any conduct by a maintenance company
11  negligent?
12  A.  I did.
13  Q.  Do you know what happened with that case?
14  A.  In terms of -- it settled.
15  Q.  Okay.
16  A.  I didn't get deposed in that one.
17  Q.  Did you have an opportunity to inspect the
18  facility, inspect the scene and inspect the Crown RC?
19  A.  Yes, sir.
20  Q.  And was it your goal to determine factors that you
21  felt could have contributed to the accident?
22  A.  Yes, sir.
23  Q.  Did you find any factors related to the Crown RC
24  itself, the design or the manufacture of it, which
25  contributed to the accident?

Page 40

1  A.  No, sir.
2  Q.  Besides the Boyle case, are you aware of any other
3  matter where you provided testimony in a matter
4  regarding a stand-up rider forklift manufactured by any
5  manufacturer?
6  A.  Testimony, no.  I have a couple -- I have probably
7  three or four still that are on-going.
8  Q.  Okay.
9  A.  There have been a couple or three others that
10  resolved before I was deposed.
11  Q.  Have you issued reports in any other cases?
12  A.  Probably.  I'd have to look.
13  Q.  In any of --
14  A.  Some of these go back a few years.
15  Q.  In any of the two or three other cases, do you
16  recall issuing design opinion, contending that the
17  stand-up rider forklift was designed inappropriately or
18  defectively?
19  A.  I don't recall doing that.  But the ones that are
20  on-going now, I haven't gotten that far yet.
21  Q.  Okay.
22  A.  I don't anticipate them being a design opinion.
23  Q.  Okay.
24  A.  I'd have to think about the other ones.  I don't
25  recall issuing design opinions on the other ones.

Page 41

1    Q.   Okay.
2    A.   If I have offered opinions yet in those.
3         MR. CULLEN:  Mike, this would be a good
4         time for me to review these materials, and to
5         figure out what you've brought here today.
6         I'll give you a break.  And you're welcome to
7         stay.
8    A.   Okay.
9    BY MR. CULLEN (CONT.):
10   Q.   But before I do that.  You received a deposition
11   notice in this case?
12   A.   Yes, sir.
13   Q.   Did you attempt to comply with the subpoena?
14   A.   Yes, sir.
15   Q.   Were there any aspects of the subpoena that you
16   felt you could not comply with, in other words, I
17   couldn't produce this because it was either too large,
18   or I couldn't find it, or something like that?
19   A.   You asked for a list of equipment I had testified
20   on.  And I don't keep lists like that.  So I didn't
21   compile a list like that.
22   Q.   Okay.
23   A.   I think that's the only thing.
24   Q.   But you did provide your testimony list over the
25   last four years?

Page 42

1    A.   Yes, sir.
2    Q.   Do you mind if I take a few minutes to go through
3    your materials and see what we'll mark?
4    A.   Go right ahead.
5    Q.   Now, in this notebook if I -- because I'm going to
6    identify several for the record and not mark them,
7    because I'm sure I have them already.
8    A.   Okay.
9    Q.   Can I pull materials out that I want to mark as
10   exhibits?
11   A.   There's no sacred order there so have at it.
12   Q.   Okay.
13        MR. CULLEN:  Mike, probably I'll be
14        sitting here doing it.  You can take a break
15        and stretch your legs, you can as well, and
16        then we'll come back and put some things on
17        the record.
18   A.   Okay.
19        MR. WARSHAUER:  Okay.
20        (A recess was had.)
21   BY MR. CULLEN (CONT.):
22   Q.   What I've done is destroyed your notebook.
23   A.   No problem.
24   Q.   Pulled materials out that I wish to mark and we'll
25   put these back in.

Page 43

1    A.   Okay.
2    Q.   I was not having as much success getting them back
3    in as I hoped.
4    A.   It's touch with this notebook.
5    Q.   It is.  And I'll identify what I don't mark for
6    the record, just to know what you have.
7    A.   Okay.
8    Q.   But there's some things I do want to specifically
9    mark as exhibits.
10   A.   All right.
11   Q.   Just to identify, for the record, I note that in
12   your file you have the notice to take deposition here
13   today, Crown's answers to interrogatories -- answers to
14   interrogatories, answers to first and second request for
15   production, the complaint, the confidentiality order and
16   your signature page of that, you have a copy of the
17   Crown specifications for the RR 5200 series trucks, a
18   copy of the operator manual, a copy of your preliminary
19   report, which I'll leave out for you in case you need it
20   later.
21   A.   Okay.
22   Q.   You also have copies of Mr. Berry's report, a copy
23   of Bates number 10413, which is the Crown RR and RC
24   accident summary 2011.  You also have a copy of Crown
25   010425, which is an accident listing attached to that

Page 44

1    accident summary.
2    A.   Okay.
3    Q.   You have a copy of -- make sure it is what it
4    appears to be.  Mr. Hunt's report, dated 2/3/2014, a
5    copy of Mr. Elrod's report of that same date.
6    A.   One of them has colored photos and the other one
7    doesn't.  That's why I kept it.
8    Q.   Okay.
9    A.   Just so you'll know.
10   Q.   And I'll mark this other one later.  A copy of Mr.
11   Rushing's economic analysis, a copy of Mr. Toliver's
12   report, dated February 2014, and a copy of the Safety
13   Standard for Low Lift and High Lift Trucks, ASME
14   B56.1-2000.  Did you bring any other or review any other
15   versions of the safety standards for this truck?
16   A.   No, not for this case I did not.
17   Q.   Any subsequent versions to this?
18   A.   No.
19   Q.   So that's what I have identified.
20   A.   Okay.
21   Q.   And will not mark.  And actually I'll add to that.
22   A.   Okay.
23   Q.   A copy of the operator manual, but just in its
24   form given to operators, the "Third Edition of
25   Kinesiology", Cooper and Glassow.

Page 45

1    A.   Okay.
2    Q.   Which we'll leave here to see if there is any
3    questions that may be generated from that.
4    A.   All right.
5    Q.   As well as a copy of Mr. Hernandez's deposition
6    taken 10/16/2013?
7    A.   Correct.
8    Q.   Have you reviewed any other deposition testimony?
9    First of all, did you review this?
10   A.   I did.
11   Q.   Have you reviewed any other depositions that were
12   taken in this case?
13   A.   No, sir.
14   Q.   Now, why don't we move all this.
15   A.   Just on the ground will be fine.  Actually put it
16   in the box and put the notebook in there with it.
17   Q.   And now what we'll do is go through the materials
18   we will mark.  As Exhibit 71 I'll mark a copy dated
19   January 27, 2014, a report from Mr. Elrod.
20        (Deposition Exhibit 71 was marked.)
21   Q.   As Exhibit 72 a summary of Mr. Hernandez's
22   deposition.
23        (Deposition Exhibit 72 was marked.)
24   Q.   Did you complete the summary?
25   A.   I did not.  I called it an index because it's

Page 46

1    really not a total summary of everything, it's just the
2    points that I'm interested in.
3    Q.   And do you know who did it?
4    A.   My assistant.
5    Q.   What is his or her name?
6    A.   Her name is Shelly Parker.  Just so you'll know my
7    methodology.  I will flag the pages and the paragraphs
8    that I want on this, and then she will translate that
9    onto this document.
10   Q.   Okay.  We have a copy I'll mark as Exhibit 73 of
11   an OSHA document, entitled, "Powered industrial truck
12   hazards".
13        (Deposition Exhibit 73 was marked.)
14   Q.   I'll hand you Exhibit 73.
15   A.   Okay.
16   Q.   Where did that come from?
17   A.   Off the OSHA website.
18   Q.   Did you pull that yourself?
19   A.   I did.
20   Q.   As Exhibit 74, I will note other material from an
21   OSHA website that seemed to be related to forklifts
22   design issues and employer issues.
23   A.   Yes.
24        (Deposition Exhibit 74 was marked.)
25   Q.   So is that training regulations regarding --

Page 47

1    A.   Plus the OSHA regulations for forklifts.
2    Q.   Okay.  I'll mark as Exhibit 75 a copy of a
3    document entitled, DVD Safety on the move.
4        (Deposition Exhibit 75 was marked.)
5    Q.   And ask you what this document is?
6    A.   Let me see it.  I'm not sure what it is.  It's out
7    of another case.  I put this in there to show the
8    control configuration of another truck that I referenced
9    in my report.
10   Q.   Was that a Raymond truck?
11   A.   It was.
12   Q.   Okay.
13   A.   Or it is.
14   Q.   And does it show a different foot pedal
15   configuration to what the Crown RR 5200 series has?
16   A.   It shows a different control configuration.
17   Q.   Okay.  As Exhibit 76 we will mark a grouping of
18   accident reports that are not really in any order, so I
19   can't just identify the numbers.
20        (Deposition Exhibit 76 was marked.)
21   Q.   And I would ask you do you know how this
22   compilation of accident reports was created?
23   A.   I do.  That came out of the -- there was the other
24   grouping.
25   Q.   Okay.

Page 48

1    A.   I asked one of my engineers to go through and find
2    any reports that related to steering issues, and these
3    were pulled out as part of that.
4    Q.   Just so I'm clear.  Exhibit 76 is a compilation of
5    accident reports, which you believe have indicated some
6    steering issues?
7    A.   Yes, sir.
8    Q.   And that may be related to an accident?
9    A.   Yes, sir.
10   Q.   Okay.
11   A.   I think they're all accident reports, and issues
12   related to steering are part of that.
13   Q.   And who did the search to find these?
14   A.   My engineer, Ed Beard.
15   Q.   And this goes back to -- does this go back to the
16   beginning of the Crown RR and RC series, or is it
17   limited just, for instance, to the RR 5000 series?
18   A.   It's whatever was provided as part of the
19   discovery, however far back it goes.  I know it goes
20   back a substantial number of years.
21   Q.   I see some of these dated back into the early
22   nineties at least?
23   A.   Right.
24   Q.   Okay.  And from these materials what did you
25   ascertain after reviewing this grouping of accident

Page 49

1   reports?
2   A.   Primarily that there were -- that failures of
3   steering are not an isolated incidents.  They've had
4   them before.
5   Q.   Okay.  Do you know roughly how many you have?
6   A.   They're numbered.  25, I think, about 25.  What's
7   the last number?
8   Q.   25.
9   A.   Yeah.
10  Q.   Okay.  Over how long?
11  A.   Over a period of whatever number it started.
12  Q.   40 years?
13  A.   How many years?
14  Q.   Mid-seventies to --
15  A.   Is that when they started?
16  Q.   Yes.
17  A.   Okay.
18  Q.   Okay.
19  A.   Actually it would start with whenever the first
20  one was.
21  Q.   Sure.  Right.  As Exhibit 77 I'll mark a copy of
22  the maintenance records you received regarding this
23  action.
24  A.   Okay.
25          (Deposition Exhibit 77 was marked.)

Page 50

1   Q.   Did you find any maintenance issues, maintenance
2   failures or negligence in the maintenance of this truck
3   that you would attribute to some party in this case?
4   A.   No.
5   Q.   Did you review it for that basis?
6   A.   I did.
7   Q.   Do you recall who did the maintenance on this
8   truck?
9   A.   Not without looking.  But I can look.
10  Q.   Okay.
11  A.   These I think are all Lowe's work orders.  So
12  these would be done by Lowe's, the owner of the truck.
13  Q.   As collective Exhibit 78 there were three
14  photographs that, if they're related, I can't figure out
15  how they're related, but I'll mark them together.  One
16  is a Raymond serial number plate?
17  A.   Right.
18  Q.   And then there is a Crown serial number plate?
19  A.   Okay.
20  Q.   And then a picture of a Crown stand-up rider RR
21  type forklift?
22  A.   Right.  Two of them are related.  Well, they're
23  not all related to each other except the last two.
24  Q.   Okay.
25  A.   The last two are the first two photos of the truck

Page 51

1   that were sent to me before I inspected it.
2   Q.   Okay.
3   A.   That Raymond is one that has a pedal that's for
4   the right foot.
5   Q.   Okay.
6   A.   That I inspected in another case.
7   Q.   Then I will separate the photos and mark these two
8   as collective 79, which are the accident truck?
9   A.   Yes, sir.
10  Q.   Okay.
11          (Deposition Exhibits 78 and 79 were
12          marked.)
13  Q.   And this 78 is just a serial number identifying a
14  type of truck manufactured by Raymond, which you believe
15  has a different type of foot pedal arrangement in the
16  operator --
17  A.   Correct.
18  Q.   And as Exhibit 80 we'll mark a two-page exhibit,
19  which is the drive unit parts of the traction motor of I
20  take it a Crown RR series forklift?
21  A.   Yes, sir.
22          (Deposition Exhibit 80 was marked.)
23  Q.   Why did you pull these two-pages from our service
24  and parts manual?
25  A.   I was actually trying to figure out the drive

Page 52

1   system on this.  I requested this from the dealership.
2   This doesn't relate to my opinions, other than it's a
3   non-DC motor, it's an AC motor.
4   Q.   Okay.  As Exhibit 81 I will mark an email between
5   yourself and Mr. Ed Beard, who I take it is an engineer
6   that works with you?
7   A.   Yes, sir.
8          (Deposition Exhibit 81 was marked.)
9   Q.   And he is an engineer?
10  A.   Yes.
11  Q.   And this appears to be a discussion regarding
12  accident reports involving contactors, Curtis Albright
13  contactors?
14  A.   That may relate to another case.  Should not be in
15  this file maybe.
16  Q.   It's got Crown accident reports though.
17  A.   Okay.  The bottom part related to another case.  I
18  just responded to an email asking to look for some other
19  things, and the Crown accident reports that are similar
20  to those other -- so that's what that's for.
21  Q.   Okay.  And I take it Mr. Beard was looking for
22  issues regarding balance, loss of power steering, change
23  of direction and jerking type motions?
24  A.   Correct.
25  Q.   Okay.  And he found, again, over the -- do you

Page 53

1  know roughly how many accident reports there were in
2  this case?
3  A.   A lot.
4  Q.   Over 3,000?
5  A.   A bunch, yeah.  Actually he and my assistant
6  looked for those specific issues.  I divided them up
7  because there were so many.
8  Q.   It appears as he found five reports?
9  A.   Right.
10  Q.   Within that?
11  A.   Correct.
12  Q.   Do you know if Mr. Beard looked at all the
13  accident reports?
14  A.   Well, between he and my assistant, they looked at
15  all of them.  And they're not printed out, but they're
16  on the disk that's somewhere.
17  Q.   One of the disks here?
18  A.   Yes, sir.
19  Q.   So you did receive all of the Crown accident
20  reports?
21  A.   Yes, sir.
22  Q.   So on these three issues, balance, loss of power
23  steering, loss of power, change direction jerking
24  motions, they were able to identify from their search
25  five reports?

Page 54

1  A.   Well, no.  That would be coupled with the other
2  ones.
3  Q.   The steering issues?
4  A.   These I think were found by my assistant.  What I
5  asked them to do was go through the CDs, and only print
6  the ones out that related to those issues.  Mr. Beard
7  had those and my assistant did these for me.
8  Q.   Okay.
9  A.   Okay.
10  Q.   So Mr. Beard found these five and your assistant
11  found the 25?
12  A.   Right.
13  Q.   Okay.
14  A.   They weren't duplicative efforts.  She took
15  one-half of the reports and he took the other half.
16  Q.   I see.  Okay.  So they split them up basically
17  half and half and went through them?
18  A.   Yes.
19  Q.   So on all of these issue your assistant and Mr.
20  Beard found approximately 30 accident reports they
21  deemed relevant to these issues?
22  A.   Yes, sir.
23  Q.   Fair statement?
24  A.   Fair statement.
25  Q.   Okay.  The next document we'll mark as Exhibit 82.

Page 55

1         (Deposition Exhibit 82 was marked.)
2  Q.   And it appears to be a printouts from Raymond and
3  Toyota and Machino regarding different types of trucks.
4  And just ask you what your goal was in gathering that
5  and what relevance that may have here?
6  A.   These were all trucks that had a right actuated
7  brake pedal.
8  Q.   Right.
9  A.   Foot actuated brake pedal, stand-up riders.
10  Q.   From your review and analysis of other
11  manufactured data and review of the internet, did you
12  find many other stand-up riders that have a left foot
13  brake?
14  A.   I did.
15  Q.   Would you agree with me that there are many more
16  manufacturers and trucks out there with a left foot
17  brake than a right foot brake?
18  A.   I don't think, based on what I see, I could make
19  that assessment.
20  Q.   Okay.
21  A.   I know there are right foot actuated ones and left
22  foot actuated ones.
23  Q.   Do you know either way, do you know the relative
24  comparison of the numbers of trucks, for instance?
25  A.   I do not.

Page 56

1  Q.   And do you know how many stand-up riders are
2  basically being used in the United States warehouses
3  today?
4  A.   I do not.
5  Q.   Do you know what percentage of those have left
6  foot brakes?
7  A.   No.
8  Q.   Do you have an opinion whether or not any stand-up
9  rider truck equipped with a left foot brake -- very bad
10  question.  I'll start again.
11         Do you have an opinion regarding whether all
12  stand-up rider forklifts that are manufactured with a
13  left foot brake pedal or button, whether all of those
14  are defective and unreasonably dangerous?
15  A.   I don't have that general opinion because I
16  haven't studied it.
17  Q.   Okay.
18  A.   There are some that have -- for instance, there's
19  a left foot actuated machine.  And I wouldn't consider
20  that because it has a different style of control, which
21  is what I printed out on this one.
22  Q.   Okay.
23  A.   That's the only other one I've looked at in
24  detail.
25  Q.   And what truck is that?

Page 57

1    A.   That's the Prime Mover.
2    Q.   And you didn't feel the Prime Mover was defective
3    from your design, from your review of the design?
4    A.   Correct.  And I operated it as well.
5    Q.   And the Prime Mover does have a left foot brake?
6    A.   It does.
7    Q.   This next one is -- it appears to be a Crown
8    Partner Extranet that you received from Hugg and Hall?
9    A.   I think so.  Is that what it says?
10   Q.   Yes.  It just says, Hugg and Hall Equipment,
11   Little Rock.
12   A.   Correct.
13   Q.   And it appears to be a printout regarding this
14   specific truck?
15   A.   Correct.
16   Q.   And how did you obtain that?
17   A.   I just called and asked for the spec sheet on that
18   serial number and see what all the features were.
19   Q.   Okay.  I'll mark that as Exhibit 83.
20          (Deposition Exhibit 83 was marked.)
21   Q.   I take it you have a relationship with someone at
22   Hugg and Hall that you can call?
23   A.   I just call them.  I know a few of them.  That's
24   the reason I call them.
25   Q.   Can they just give you that on any truck?

Page 58

1    A.   Well, they have several manufacturers.  I don't
2    know that other truck manufacturers have a sheet like
3    that.
4    Q.   I'll give you this one back.  I don't need to mark
5    that.  And I don't know if these were related at all,
6    and I'm not going to worry about whether they are.
7    A.   Okay.
8    Q.   But we have a series of notes that were together
9    in your binder though.  And we're going to mark those
10   collectively, and they may have different dates and not
11   be related, but we're going to mark them collectively as
12   Exhibit 84.
13   A.   Okay.
14          (Deposition Exhibit 84 was marked.)
15   Q.   I won't mark this one either, but here is a letter
16   enclosing a CD containing Crown documents 10,413 to
17   18,361, which my guess would be this is the copy of the
18   accident reports.  We won't mark that as well.
19       As Exhibit 85 I'll mark an email regarding a
20   description of the accident.
21          (Deposition Exhibit 85 was marked.)
22   Q.   And then as Exhibit 86 we'll mark a listing of
23   your publications.
24          (Deposition Exhibit 86 was marked.)
25   Q.   And on Exhibit 86, are you aware of any other peer

Page 59

1    reviewed publications that you have contributing to the
2    scientific literature other than those listed on 86?
3    A.   No.
4    Q.   Okay.  Exhibit 87 is a copy of your engineering
5    services agreement.
6          (Deposition Exhibit 87 was marked.)
7    Q.   Which was dated here February 22, 2013?
8    A.   Okay.
9    Q.   And then as collective 88 we'll mark the copy of
10   all of your invoices in this case.
11          (Deposition Exhibit 88 was marked.)
12   Q.   And I'll just do a rough calculation without
13   intending to be specific.  From my brief review, it
14   appears to be approximately $28,000 in charges from 2013
15   to February 28, 2014?
16   A.   Okay.
17   Q.   I take it since this last bill is dated 2/28,
18   there may be additional time preparing for this
19   deposition?
20   A.   Yes, sir.
21   Q.   Any estimate of the time you've spent in March and
22   early April?
23   A.   No idea, no, sir.  I don't think it was very much
24   except for the deposition preparation.
25   Q.   And obviously we're compensating you for your time

Page 60

1    today.
2    A.   Okay.
3    Q.   I don't know if we already have or not but --
4    A.   That's not always the arrangement.  Whatever the
5    arrangement is.
6    Q.   Does that sound about right, a little less than
7    $30,000?
8    A.   I haven't even looked at those.  I'll take your
9    word for it.
10   Q.   And then we'll mark -- are these copies of these
11   CDs?
12   A.   Yes.  You can have a copy except for one of them.
13   There's one of them I think -- actually that's the
14   discovery.  There should be a copy of my inspection
15   video and photos.  Actually I only did one video, which
16   is the inspection video.
17   Q.   I'll just identify, for the record, but I won't
18   attach this.
19   A.   Okay.
20   Q.   Crown documents 10,413 to Crown 18,361.
21   A.   Right.  It matches that list right there.
22   Q.   And we'll mark as 88 your inspection photographs.
23          (Deposition Exhibit 88 was marked.)
24   Q.   Is this a hard copy of this?
25   A.   It is.

Page 61

1    Q.   Okay.
2    A.   I wasn't sure you were coming. When Mr. Warshauer
3    told me you were coming, I had already made that CD.
4    Q.   I appreciate that.
5    A.   You can have it. It's the same thing that's on
6    there.
7    Q.   So we'll give you these back?
8    A.   You can have those. It's up to you. If you want
9    the hard copies you can have them.
10   Q.   I appreciate that.
11   A.   The CD too, if you want that.
12   Q.   We'll mark it as Exhibit 88, and we'll just
13   identify that I took a hard copy with me.
14   A.   Okay.
15   Q.   And then as Exhibit 89, inspection, you also did a
16   video at the inspection?
17   A.   Yes, sir.
18          (Deposition Exhibit 89 was marked.)
19   Q.   And this appears to be another inspection video?
20   A.   Yeah. One of those I need back because they're my
21   originals. These are duplicates.
22   Q.   Is there any one you want back?
23   A.   No.
24   Q.   Does it matter?
25   A.   No.

Page 62

1    Q.   Okay. And then you have 10/31/13 Hernandez v
2    Crown forklift videos?
3    A.   That is a video of I believe Mr. Berry that I got
4    a copy of. It was -- he videoed me operating the truck
5    at the inspection.
6    Q.   Okay.
7    A.   And that is my original. So I guess we'll have to
8    get a copy of that.
9    Q.   No problem. We'll mark it as Exhibit 90, but
10   leave it with you so we can get a copy.
11   A.   All right.
12          (Deposition Exhibit 90 was marked.)
13   A.   Mr. Warshauer probably has a copy of this he can
14   give you. Unless you want me to make it, I can do that
15   too.
16   Q.   Either way. Believe it or not, it is probably
17   easier to get it from you, because I know how things go
18   in my office when --
19   A.   That's fine.
20   Q.   When we leave here, Mike has many other things.
21   A.   All right. I'll do that.
22   Q.   That's all the exhibits unless something occurs.
23   And why don't I take the ones we're just not marking and
24   put them back in there.
25   A.   All right.

Page 63

1    Q.   So we only have in front of you what we're going
2    to talk about. We'll add these to our list here.
3    A.   You didn't mark this, right?
4    Q.   I did not. I'll leave that for you just in case.
5    You can refer to it as we go through your report.
6    A.   Okay.
7    Q.   Now, in terms of your testimony history, are you
8    aware that on occasions your qualifications and/or
9    opinions have been challenged in legal matters?
10   A.   I am.
11   Q.   Are you aware of any instances where the challenge
12   was successful, in other words, your testimony has been
13   limited or stricken in its entirety?
14   A.   I am aware of one case where I was not allowed to
15   proffer an ancillary warnings opinion to my primary
16   opinion.
17   Q.   Do you know the basis for that opinion, was it you
18   were not qualified, or the specific opinion was
19   unreliable?
20   A.   Well, my opinion was that the warnings should have
21   been more specific. And the judge ruled that there was
22   already a warning on the machine.
23   Q.   Okay.
24   A.   But again, that was a -- my preferred method of
25   addressing the problem associated with that case were

Page 64

1    designed related as opposed to warnings.
2    Q.   What was the type of machine involved there?
3    A.   It was a baler, cardboard baler.
4    Q.   And you recall the jurisdiction state or --
5    A.   Pennsylvania.
6    Q.   Okay.
7    A.   I'm not sure. It would have been near
8    Philadelphia.
9    Q.   Do you recall being stricken and/or limited in a
10   case in Michigan?
11   A.   Stricken or limited, what do you mean?
12   Q.   In terms of your testimony, where portions of your
13   testimony were not allowed to be presented to the jury?
14   A.   Not that I'm aware of.
15   Q.   Okay. Any other cases you're aware of besides the
16   Pennsylvania case?
17   A.   No.
18   Q.   Is the Pennsylvania case on your list that we
19   discussed or was it before that?
20   A.   I actually never got deposed in that case. It was
21   related to my report and the disclosure document, I
22   believe.
23   Q.   Okay. Do you know -- do you know the name of that
24   case?
25   A.   The plaintiff was Mkadji, and I cannot remember

Page 65

1   who the defendants were.  It was a baler manufacturer.
2   Q.   I think I just asked this, and I apologize if I
3   did.  Are you aware of any other cases besides the
4   Mkadji case that you're aware your opinions have been
5   limited or stricken, or some way modified from what you
6   intended to offer to the jury?
7   A.   Not that I'm aware of.
8   Q.   Okay Now, turning to your specific opinions in
9   this case.  What were you retained to do by Mr.
10  Warshauer's group, his law firm, in your analysis in
11  this matter?
12  A.   My primary role was to take a look at the machine
13  controls and the design of the machine in terms of
14  controls and operational characteristics.
15  Q.   And what was your -- was your task limited to the
16  operational controls, or look at the machine and tell me
17  if you believe this machine in any regards is defective,
18  and/or unusually dangerous, which could have contributed
19  to this accident?
20  A.   Well, it's normally that broad.  But specifically,
21  I know Mr. Warshauer had some other experts focusing on
22  other specific aspects of the machine.
23  Q.   Okay.  So you felt your task was limited to the
24  operator controls?
25  A.   Machine design in terms of the way it operates in

Page 66

1   general, yes, sir.
2   Q.   Okay.  And in reviewing the accident here, did you
3   have an opportunity to speak with Mr. Hernandez himself?
4   A.   I did.
5   Q.   Was that at the inspection?
6   A.   It was.
7   Q.   Did you record that conversation or communication
8   in any way?
9   A.   I did not.  Actually most of the conversation was
10  between Mr. Warshauer and Mr. Hernandez. I was just
11  listening.
12  Q.   Okay.  Anything you remember, did he describe the
13  accident to you?
14  A.   In general, yes, sir.
15  Q.   Did you find it in any way distinct or different
16  from what you read in his deposition?
17  A.   No.
18  Q.   And as an expert in this case, are you relying
19  upon the testimony he gave in his deposition to form
20  your opinions regarding how the accident occurred?
21  A.   Yes, sir.
22  Q.   Have you accepted the entirety of Mr. Hernandez's
23  testimony regarding his accident, or did you go behind
24  it to challenge whether this actually occurred?
25  A.   I'm not sure I understand your question.

Page 67

1   Q.   It was a horrible question.  From an engineering
2   standpoint, did you find any parts of Mr. Hernandez's
3   testimony implausible or inconsistent with laws of
4   physics or engineering?
5   A.   I did not.
6   Q.   Did you accept all aspects of his testimony as
7   precisely true?
8   A.   With regard to how the accident occurred?
9   Q.   Yes.
10  A.   Generally I did, yes.
11  Q.   Okay.  From your review of the maintenance records
12  and the testimony in this case, had this forklift
13  experienced any mechanical problems during its operation
14  before this accident, on the day of the accident?
15  A.   On the day of the accident?
16  Q.   Yes.
17  A.   Not that he testified to.
18  Q.   Okay.  Have you reviewed in this case any
19  testimony, summaries of testimony or bullet point
20  summaries, any materials that would give you an
21  understanding of what mechanics and other individuals
22  knowledgeable about this truck said about its operation
23  before, during and after this accident?
24  A.   I have only read Mr. Hernandez's deposition, no
25  other documents.

Page 68

1   Q.   Have you been provided with copies of the accident
2   investigation materials from Lowe's regarding what they
3   found about how the accident occurred and why it
4   occurred?
5   A.   Did you see it in my notebook?
6   Q.   No.
7   A.   Then I have not.
8   Q.   Okay.  And that's what I'll ask you.  I think I've
9   identified everything you brought here today.  Have you
10  ever been provided with Lowe's, their assessment and
11  their investigation, including their analysis of the
12  root cause of this accident?
13  A.   No.  I didn't know that existed.
14  Q.   Is that something you typically get in cases?
15  A.   Sometimes.  I'm at the mercy of whatever I'm
16  provided in a case.
17  Q.   Right.  Have you seen any testimony or summaries
18  of testimony of any mechanics who worked on this truck?
19  A.   No.
20  Q.   Any individuals who investigated this accident?
21  A.   No.
22  Q.   Just before we try to break it down, as you know,
23  we always do in these cases.
24  A.   Yes.
25  Q.   Give us your general understanding of how this

Page 69

1    accident occurred?
2    A.   Mr. Hernandez was coming from the main aisle
3    trying to turn out in between two of the stocking aisles
4    he.  He attempted to plug brake and slow down.  Which
5    happened -- which happened properly the first two times
6    according to his testimony, or two or three times.  The
7    third time he -- and that's not uncommon to try to plug
8    brake by going into and out of -- that's a common way to
9    do it.  The last time when he tried to do that, he was
10   not able to plug brake, and the steering -- he lost his
11   power steering, which did not allow him -- did not allow
12   him to complete his turn, and he collided with the end
13   cap of one of the aisles, the curb.  I believe aisle 334
14   was the aisle.  I'm not sure which side it was on.
15   Q.   Okay.  So just to recap.  He's making a right
16   turn?
17   A.   Yes, sir.  Right being forks trailing as he's
18   turning to the right.
19   Q.   Correct.
20   A.   Yes.
21   Q.   You told us that, from your review of his
22   testimony, he was slowing, attempting to slow by using
23   the plugging function on the truck?
24   A.   Correct.
25   Q.   And on the first couple of occasions he did that

Page 70

1    the plugging worked, according to him, in other words,
2    he did experience deceleration from plugging?
3    A.   Yes, sir.
4    Q.   And then did he feel he needed to plug again, I
5    guess to continue to slow?
6    A.   Apparently, yes, sir.
7    Q.   So while after plugging the second time, did he
8    give it more traction, in other words, did he reverse
9    plugging and then go back in the direction he was
10   turning?
11   A.   Say that again?
12   Q.   Sure.
13   A.   Did he accelerate in the same direction he was
14   going I think is your question?
15   Q.   Yes.  After plugging the second time, did he just
16   let it go to neutral or did he accelerate?
17   A.   I don't recall that being his testimony that he
18   accelerated.
19   Q.   Okay.  And so on his third attempt to plug, what
20   allegedly happened, according to Mr. Hernandez?
21   A.   Nothing happened.  He did not -- he was not able
22   to plug and he lost power steering at the same time, I
23   believe, according to his testimony.
24   Q.   So he did not experience any deceleration, at
25   least in his feeling?

Page 71

1    A.   Correct.
2    Q.   Okay.  Have you seen any records from any source,
3    whether it be Lowe's or materials provided from any
4    source, where any individuals inspected this truck to
5    determine if there were any issues regarding the
6    plugging?
7    A.   It seems like Lowe's took a look at it afterwards,
8    but I wouldn't swear to that.
9    Q.   Okay.
10   A.   Those invoices, wherever they are.  And your
11   question is did anybody look at it after the accident?
12   Q.   Yes, that you know of?
13   A.   I don't recall anything.  I've give you an answer
14   in a minute.
15   Q.   Okay.
16   A.   At least according to the records I have.  There's
17   no inspection or work order for an inspection after the
18   accident.
19   Q.   Okay.
20   A.   That I have.
21   Q.   Have you seen any materials from any source where
22   any individual, that you know of, inspected the forklift
23   after the accident to determine if they could find any
24   evidence of a plugging failure or a plugging problem?
25   A.   I don't recall any materials.

Page 72

1    Q.   Okay.  Would the same be true if I asked you did
2    anyone after the accident inspect the truck to determine
3    if there were any braking failures or steering problems
4    or failures?
5    A.   I seem to recall something to that effect.  You
6    can tell me.  I don't think I have any of those
7    documents.
8    Q.   From what I've identified here, and I believe I've
9    marked everything --
10   A.   I don't have any documentation.
11   Q.   Okay.
12   A.   To that effect.
13   Q.   Okay.  Just so I'm clear, because I think my
14   question was bad.  Are you aware of and have you seen
15   any documentation of an inspection of this forklift,
16   after the accident, to determine whether or not there
17   were any documented steering, braking or plugging
18   problems?
19   A.   No, sir.
20   Q.   After he is making the right turn, attempts to
21   plug twice, and gains deceleration or feels
22   deceleration, and then on the third occasion does not
23   experience deceleration, does he take any further
24   actions after that to avoid an accident?
25   A.   He lifts his foot from the brake pedal.

Page 73

1   Q.   Okay.  Do you know how he did that, in other
2   words, did he lift his left heel, did he lift his left
3   forefoot, did he lift his entire foot?
4   A.   I believe his testimony was that he lifted his
5   foot off the brake pedal, whatever degree of that it is.
6   Q.   From reading the operator manual, did you
7   determine you can operate this left foot brake by moving
8   just a portion of your foot off it?
9   A.   Depending on where your foot is positioned you
10  can, yes, sir.  I know that's a suggestion in the
11  manual, I believe.
12  Q.   In the manual would you agree with me that it
13  recommends that an operator use their left heel and keep
14  their forefoot on the floor?
15  A.   Something to that effect, yes, sir.
16  Q.   Okay.  And when he lifted his left foot, heel or
17  forefoot off the brake did the brake work?
18  A.   Apparently, yes, sir.  It rapidly decelerated.
19  Q.   Is that what it's designed to do?
20  A.   It is.
21  Q.   Do you have an opinion whether or not the design
22  of the braking system of the Crown RR 5200, not the
23  location of the pedal, but whether the braking system
24  itself was in any way defective?
25  A.   I don't have an opinion it's -- I have -- it's my

Page 74

1   opinion it's not defective.  It's an emergency brake, it
2   did what it was supposed to do.
3   Q.   Okay.  Have you in any way attempted to calculate
4   the braking force or the acceleration or deceleration
5   associated with applying the left foot brake on a Crown
6   5200 series truck?
7   A.   No.  But I have calculated percentage difference
8   distances and stopping distances, percentage difference
9   in stopping distance versus plugging.
10  Q.   Okay.  Just to be clear.  Have you ever tested a
11  Crown RR 5200 to determine what is the G-force or the
12  acceleration or deceleration of force applied to an
13  individual when he or she operates the left foot brake?
14  A.   No, personally I have not.  I believe that's been
15  done by others in reference to Mr. Berry's report.
16  Q.   Okay.  And when Mr. Hernandez applied the brake,
17  what did he then allege happened to his posture?
18  A.   His leg was forced outside of the envelope of the
19  machine, and got between the curb of the end of the
20  aisle and the skirt of the front of the truck.
21  Q.   And do you accept that testimony?
22  A.   I do.
23  Q.   Have you done any independent analysis of the
24  truck of the forces applied to Mr. Hernandez to support
25  that opinion?

Page 75

1   A.   I operated the truck.
2   Q.   Okay.
3   A.   My experience was that it caused me to -- unless I
4   would be ready for it, I would lose my balance, when I
5   was braking from about half speed to use the emergency
6   brake to stop.
7   Q.   How long did you operate the truck?
8   A.   At the inspection probably 10 to 15 minutes.  I
9   don't think you were there.
10  Q.   No, I was not there.
11  A.   10 or 15 minutes.
12  Q.   Did you turn the truck?
13  A.   I did.
14  Q.   Did you brake the truck?
15  A.   I did.
16  Q.   Several times?
17  A.   Not breaking it, but braking it actually --
18  Q.   Yes, not destroying it.  Did you apply the brake?
19  A.   I did.
20  Q.   Did you also plug the truck?
21  A.   I did.
22  Q.   And at any time during your 10 or 15 minute
23  operation of the stand-up rider truck, did you lose your
24  balance?
25  A.   I did.

Page 76

1   Q.   Did you fall out of the truck?
2   A.   I didn't fall out of the truck because I was
3   expecting it.
4   Q.   Okay.  Did your feet come out of the truck?
5   A.   I don't think so, because I put my foot down to
6   keep myself from coming out of the truck.
7   Q.   You certainly weren't hurt while you were
8   operating it, were you?
9   A.   I was not.
10  Q.   Okay.  At any time during your operation, did you
11  measure the forces on you in any way whatsoever?
12  A.   No, I did not.
13  Q.   In other words, you know you can, you could have
14  put an accelerometer on you, or done something to
15  measure the forces as engineers do?
16  A.   An accelerometer.
17  Q.   And you didn't do that?
18  A.   I did not.
19  Q.   Okay.  Now, I want to determine -- and I think you
20  said in your report that Mr. Hernandez lost his balance?
21  A.   Correct.
22  Q.   And certainly you've told us that's what his
23  testimony was?
24  A.   Yes, sir.
25  Q.   Besides his testimony, I want to know every other

Page 77

1  thing you rely upon to support the opinion stated in
2  your report that Mr. Hernandez lost his balance?
3  A.  We have my operation experience with it obviously.
4  I could probably get close on acceleration or
5  deceleration rates based on my video and the stopping
6  distance.  And you're talking about what I relied on?
7  Q.  Yes.
8  A.  Primarily those things.
9  Q.  Anything else you can think of?
10  A.  As far as losing --
11  Q.  That part of your opinion, not everything?
12  A.  Well, "Kinesiology" talks about human standing and
13  balance.  It's all about -- it comes down to statics and
14  dynamics in terms of the center of gravity.  And so my
15  engineering training related to that as well.
16  Q.  And I think you told us that you felt you can lose
17  your balance because unless you expect the deceleration
18  as an unexpected event, you're more likely to lose your
19  balance?
20  A.  Say that again?
21  Q.  I'll just ask it without the first part.
22  A.  Thank you.
23  Q.  I think I read in your report that operators are
24  more prone to lose balance when they engage in an
25  activity that's unexpected to them?

Page 78

1  A.  Correct.
2  Q.  Okay.  So in other words, if there's significant
3  deceleration that they don't expect, they're more prone
4  to lose their balance, correct?
5  A.  Correct.
6  Q.  If they expect a deceleration, they're ready for
7  it and they can balance themselves more appropriately?
8  A.  Yes, sir.
9  Q.  Now, in this case Mr. Hernandez applied the brake,
10  correct?
11  A.  Yes.
12  Q.  He expected deceleration?
13  A.  I'm not sure he expected the kind of deceleration
14  he experienced.
15  Q.  And --
16  A.  We don't know from Mr. Hernandez's prior operation
17  whether he ever had an experience like this before.
18  Q.  You would agree with me that he testified he
19  applied the brake on many occasions before this
20  incident?
21  A.  Is that in his testimony?
22  Q.  Yes.
23  A.  Okay.  Did he describe exactly how?
24  Q.  I don't think he did.  I don't want put words -- I
25  don't want you to just accept my --

Page 79

1  A.  I seem -- I seem to recall that.  But I don't
2  recall there being any specific questioning or testimony
3  that he -- he had an experience simular to this before.
4  Q.  Do you know, was Mr. Hernandez involved in any way
5  that you know of, in training operators how to
6  appropriately operate Crown stand-up riders?
7  A.  He was.
8  Q.  And do you recall he trained individuals how to
9  use both the plugging function?
10  A.  Yes, sir.
11  Q.  And also how to use the foot brake?
12  A.  Yes.
13  Q.  And he had done that on many, many occasions
14  before this accident?
15  A.  Correct.
16  Q.  And when he lifted his left -- portions of his
17  left foot, he told us he expected deceleration?
18  A.  Sure.
19  Q.  Was there anything about this situation that you
20  feel was distinct from deceleration in other situations,
21  in other words, was there something about this
22  particular event that increased the deceleration force,
23  other than what he had experienced in the past?
24  A.  No, I don't think the -- I think the deceleration
25  forces are going to be the same.  It's the panic

Page 80

1  reaction that changes his response to how he deals with
2  it.
3  Q.  I take it you're accepting his testimony that he
4  had a panic type reaction?
5  A.  Well, based on the accident, he had to have had a
6  panic type reaction.
7  Q.  Okay.
8  A.  It's reasonable to infer that as you're
9  approaching an aisle that you know you're going to hit,
10  that your response would be different than if you were
11  just braking the truck.
12  Q.  You make a statement in your report that operators
13  who are dealing with unexpected events can lose their
14  balance?
15  A.  Yes.
16  Q.  Is there any -- and you told us some of the basis,
17  that you've operated the truck, you have Mr. Hernandez's
18  testimony?
19  A.  Right.
20  Q.  Are you relying upon any scientific or engineering
21  literature that you know of that would support an
22  opinion here that an operator of a stand-up rider
23  forklift in this configuration would lose balance upon
24  deceleration?
25  A.  Say that again?  Am I relying on what?

Page 81

1   Q.   Is there any scientific or engineering literature
2   that you're aware of that indicates or provides support
3   for your opinion that an operator of a stand-up rider
4   forklift, who applies the left foot brake, experiences
5   enough deceleration force to lose his or her balance and
6   come out of the truck?
7   A.   Are you limiting it only to a specific study on a
8   stand-up rider or general engineering principles?
9   Q.   I'll start with the first question.  Then I'll ask
10  you about general engineering principles.  How about are
11  you aware of any study that has tested that concept on a
12  stand-up rider forklift, and shown that the forces are
13  sufficient to cause an operator to be partially ejected
14  from a compartment?
15  A.   I'm aware of one that is referenced in Mr. Berry's
16  report.
17  Q.   Do you know the name of it?
18  A.   No.  But I think I probably could find it if you'd
19  like me to.
20  Q.   Is it referenced in Mr. Berry's report?
21  A.   Yes, sir.
22  Q.   Is that something you found just from reading his
23  report?
24  A.   Correct.
25  Q.   Have you ever read the study?

Page 82

1   A.   No.  I think it specifically talks about issues.
2   There's a specific study done on stand-up riders that
3   shows that operators can -- it may be the specific words
4   you asked me.
5   Q.   Other than what is referenced in Mr. Berry's
6   report, are you aware of any specific study on stand-up
7   riders which quantifies the deceleration force, and says
8   that force is sufficient to cause a complete or partial
9   ejection from the truck?
10  A.   You wouldn't have a study like that.  I mean,
11  there are too many unknowns you're putting in there
12  generally.
13  Q.   Okay.
14  A.   You can lose your balance on anything, given the
15  right circumstances, depending on how fast you're going.
16  Any force where you're stopping, if you don't compensate
17  for it you can lose your balance.
18  Q.   Okay.
19  A.   Especially if you're standing on one leg and your
20  center of gravity -- it comes down to center of gravity.
21  When it gets outside the footprint of however you're
22  supporting the object, then you become unstable.  That's
23  basics physics and engineering.
24  Q.   And that's some of the general engineering
25  principles you were referencing earlier?

Page 83

1   A.   Right.  And I've done many center of gravity
2   studies on other equipment.
3   Q.   Okay.  What was Mr. Hernandez's center of gravity?
4   A.   Where was it?
5   Q.   Yeah.
6   A.   Generally it's about 55 percent of the height plus
7   about a centimeter.  That's the general answer from
8   metric data.  So it's about one and a half centimeters.
9   Q.   So above his waist?
10  A.   Yes, sir.
11  Q.   Did any part of his hip or waist come out of the
12  compartment that you know of?
13  A.   Well, nobody saw the accident.  He doesn't recall.
14  I would say that a portion of his hip almost would have
15  had to have gotten outside the envelope for his foot to
16  get in the position it was to be crushed.
17  Q.   Okay.  Do you recall his testimony that only his
18  leg came out?
19  A.   Right.  But the leg is attached to his hip.  And
20  depending on how he's leaning.  But yeah, it may or may
21  not have.  It would have been close if it did not.
22  Q.   Okay.  As you said, there are no witnesses to the
23  accident?
24  A.   Right.
25  Q.   And we'll talk about -- I want to get the general

Page 84

1   engineering literature first or in just a minute.
2   A.   Okay.
3   Q.   But even more generally regarding stand-up rider
4   forklifts.
5   A.   Okay.
6   Q.   And I agree with you that there's some tests you
7   wouldn't do.
8   A.   Right.
9   Q.   But as you sit here today, are you aware of
10  studies that have measured deceleration forces on
11  stand-up rider forklifts, and then come to quantify
12  those forces, other than those referenced in Mr. Berry's
13  expert report?
14  A.   I've actually participated in those, not
15  specifically -- not specifically on a stand-up rider,
16  but on a center-riding pallet truck, which it would be
17  the same.
18  Q.   Okay.
19  A.   Probably 30 or 40 test runs.
20  Q.   And what did you find there?
21  A.   The decelerations?
22  Q.   Yeah.
23  A.   I would have to go back and look at my data.  The
24  truck I was driving was outfitted with an accelerometer
25  by the accident reconstructionist.  But I have the data.

21 (Pages 81 to 84)

Page 85

1  I can get that for you.
2  Q.   And if you -- when you operated that center
3  console truck, did you have any problems keeping your
4  balance on that truck?
5  A.   No, because I had a handle to hold onto.
6  Q.   Okay.
7  A.   It was in front of me.
8  Q.   Okay.
9  A.   And I had a backrest behind me.
10 Q.   Okay.  Have you seen any studies or scientific or
11 engineering literature quantifying the deceleration
12 forces on a stand-up rider and the control for a
13 forklift such as the one Mr. Hernandez was operating
14 here or similar to it, a Raymond, a Crown, Toyota?
15 A.   I'm not aware of any.  I haven't researched that.
16 Q.   Okay.  And you've done no studies on stand-up
17 riders yourself regarding those sources?
18 A.   Only my operation experience.
19 Q.   And in your own experience, you didn't record any
20 data, did you?
21 A.   I didn't.
22 Q.   Okay.  During your inspection on April 23rd, and
23 we marked these photographs, you indicated you performed
24 operational tests during this inspection?
25 A.   I did.

Page 86

1  Q.   And I think you've told us that you operated the
2  truck for 10 to 15 minutes, stopped the truck, turned
3  the truck, plugged the truck?
4  A.   Yes, sir.
5  Q.   And I assume those were part of the operational
6  testing you were performing?
7  A.   Yes, sir.
8  Q.   Did you perform any other operational tests?
9  A.   Well, functional tests of the mast and the reach
10 mechanism.
11 Q.   Okay.
12 A.   Elevated the forks as high as I could get them
13 inside the facility.
14 Q.   Anything else?
15 A.   No.
16 Q.   From any of these operational tests or during any
17 of these operational tests, did you record any data, for
18 instance, did you calculate the precision stopping
19 distance, did you measure it, did you measure the lift
20 height, things of that nature?
21 A.   I did not measure the lift height, because I
22 couldn't get it all the way up.  Its published data.  It
23 was immaterial in this case.
24 Q.   Okay.
25 A.   I was generally interested in the configuration

Page 87

1  and how it functioned.  I did do stopping distance tests
2  and recorded those by video.  And then I believe -- I
3  think my notes are --
4  Q.   We have a series of notes.
5  A.   Yeah.  Do you want me to just go through these and
6  tell you what they are?
7  Q.   Okay.
8  A.   The first one would be a summary of my first
9  conversation with Mr. Warshauer when he called me.
10 Q.   Okay.
11 A.   Or his office called me.  The second one is notes
12 off of the video of the run hours and operational hours,
13 the parameters that we found on the truck, and some of
14 the acceleration and speed characteristics.
15 Q.   Okay.
16 A.   The third one is a note I made on some more of the
17 diagnostics on the truck set for aggressive plugging.
18 It's 9 out of 10.  I'm not sure it will go to 10.  I
19 believe it's set for very aggressive plugging.  The next
20 two are just notes of the layout of where the accident
21 happened, those two.
22 Q.   Okay.
23 A.   And then I did a very quick and dirty calculation
24 on the -- the last page it says, RR 5200 series at the
25 top.

Page 88

1  Q.   Okay.
2  A.   It's just my notes of the data on the machine, the
3  characteristics of it, and the model number, et cetera.
4  And then I wrote down again some of the run hours and
5  things like that.  And then at the very bottom, after I
6  got back I made a note that said, brake tests from
7  video, forks trailing.  And I had a deadman braking
8  average distance, and I had a plug braking average
9  distance.  And I just calculated the percent difference
10 in the stopping distance.
11 Q.   And what were those distances?
12 A.   The average approximate deadman braking distance
13 was about 82 inches.
14 Q.   Okay.
15 A.   Plug braking was between 96 and 108, which is
16 about a 102 average.
17 Q.   Okay.
18 A.   And so it was a 24 percent difference in braking
19 distance from plug braking to the deadman braking.
20 Q.   Would you agree with me that both of those figures
21 are within standards allowed by ANSI B56.1?
22 A.   I'd have to look at -- I know it's in Crown's
23 manual.  It's one of their parameters.  I did compare it
24 to the standard.  Presumably it would be because it's an
25 ANSI compliant truck.

Page 89

1  Q.   And would you agree with me that those stopping
2  distances are within Crown's specifications for what a
3  range of braking they can consider acceptable?
4  A.   Yes.
5  Q.   Okay.  When you inspected this truck and reviewed
6  the truck, did you find any aspect of the truck
7  violative of any ANSI or ASME standard?
8  A.   I didn't test it to all the parameters in the
9  standards, but the areas that I was interested in, no, I
10 did not.
11 Q.   From an operational standpoint, from your review,
12 did you find any of the features of the Crown truck
13 violative of any ANSI or ASME promulgated standard?
14 A.   With regard to the features I tested, no.
15 Q.   Okay.  Why don't we take five minutes.
16 A.   Okay.
17 Q.   We've been going a little over an hour.
18 A.   Okay.
19      MR. CULLEN:  Is that all right, Mike?
20      MR. WARSHAUER:  Okay.
21      (A recess was had.)
22 BY MR. CULLEN (CONT.):
23 Q.   Now, during your inspection you noted that the
24 parameters were set to aggressive plugging, I think you
25 said?

Page 90

1  A.   Yes, sir.
2  Q.   And how did you determine that?
3  A.   I looked through the -- there's a code.  You can
4  go into the settings on the machine and look at the
5  setup for the machine.
6  Q.   Do you remember the number?
7  A.   9.
8  Q.   9?
9  A.   Yes, sir.
10 Q.   And is 9 the highest?
11 A.   I think so.  But I had 9 out of 10 on my notes, so
12 10 may be the highest.  I'd have to go back and look at
13 the manual to be sure.
14 Q.   Okay.  And so your quantification of the braking
15 and the plugging distance, how did you do that, did you
16 just literally start from a certain line and then
17 measure where you ended up?
18 A.   Yes, sir.  I had a tape laid out on the floor, and
19 I started at an expansion joint every time.
20 Q.   Okay.  And you were the operator?
21 A.   I was.
22 Q.   Besides the plugging and the stopping distances,
23 did you record any other data regarding the operation of
24 the truck during your inspection?
25 A.   I did not.

Page 91

1  Q.   Okay.  Did you open up the compartment?
2  A.   Yes, sir.
3  Q.   Did you notice anything inside the compartment
4  regarding the motors or switches that was relevant to
5  your analysis?
6  A.   I was focused initially on that area.  There
7  wasn't anything that -- I noticed a little bit of
8  burning -- well, not burning, melting of the contact
9  pads on the emergency disconnect contactor.  But that
10 doesn't apply to this accident.
11 Q.   Would you agree with me that that had no relevance
12 to this accident?
13 A.   I would.
14 Q.   Okay.  Did you find anything from your inspection
15 of the contactors, the switches, the things you were
16 looking at, that you believe contributed in any way to
17 this accident?
18 A.   No.
19 Q.   Okay.  Did you find anything from your internal
20 inspection of the compartment that was, in your opinion,
21 defective or was it an unreasonably dangerous design?
22 A.   Irrespective of the lack of the door, right?
23 Q.   Yes.
24 A.   No.
25 Q.   Okay.

Page 92

1  A.   Well, let me go back.  I've opined that the
2  necessity of removing one's outside foot from the brake
3  is a defect.
4  Q.   I'm talking about from your inspection of the
5  interworkings of the truck, the motors, the switches,
6  the contactors.  Did you see anything about the design
7  of those materials which you felt was unreasonably
8  dangerous or defective?
9  A.   About the design, no, I did not.
10 Q.   Okay.  And just to shape this up to prepare,
11 because I understand you have opinions on the brake pad
12 and where it is, the controls?
13 A.   The brake pedal.
14 Q.   The brake pedal.  And we'll get to those and
15 you've outlined those in your report.
16 A.   Okay.
17 Q.   Have you developed any opinions regarding the
18 design of our -- of Crown's traction system contactors
19 switch system regarding how power is maintained and
20 provided and distributed to the truck in this case?
21 A.   I have not.
22 Q.   Have you developed and prepared to offer any
23 opinions regarding the design of the contactors or the
24 switches in this case?
25 A.   No, I have no opinions of those.

Page 93

1  Q.  Okay.  I noted that in your report you referenced
2  the National Safety Council?
3  A.  Yes, sir.
4  Q.  And they have a manual, I believe, regarding
5  design and other issues?
6  A.  They have several manuals.
7  Q.  Okay.
8  A.  Yes, sir.
9  Q.  What is the current version of it, current
10 edition?
11 A.  I think they're up to -- I only have the 12th
12 edition, I believe, or 14th edition.  I'm not sure which
13 one they're up to.
14 Q.  Would you agree with me the National Safety
15 Council current and even former editions on safety and
16 design and engineering regarding specific products is a
17 reliable reference for engineers in the field?
18 A.  I would say in the areas that I've looked at, yes,
19 sir.
20 Q.  Okay.  You noted in your report several specific
21 standards regarding the parking brake, travel controls,
22 I believe those were the two specific ones you
23 identified.
24 A.  Let me get there.
25 Q.  716 and 719, and then components of each one.

Page 94

1  A.  What page are you on?
2  Q.  That was on page 13.
3  A.  Okay.  Thank you.  Yes, I did.
4  Q.  And those are the only specific portions of the
5  standards that you cite in your report?
6  A.  Yes, sir.
7  Q.  And have you cited or reviewed any subsequent
8  revisions to the 2000 standard?
9  A.  Not for this case.  I have in other cases.
10 Q.  Does the Crown RR 5200, that you evaluated in this
11 case, comply with these portions of the ASME B56.1 2000
12 standards?
13 A.  It does.
14 Q.  Okay.  Now, in looking at your report beginning on
15 page 13, when you detail your opinions, your first
16 opinion regards the location of the brake pedal, as you
17 call it, the emergency brake pedal?
18 A.  Yes, sir.
19 Q.  Okay.  And you feel that in this specific case it
20 should not be on the left side of the compartment?
21 A.  I do.
22 Q.  You've agreed with me in the past that there are
23 several trucks manufactured with left foot brake
24 designs?
25 A.  I would.

Page 95

1  Q.  Okay.  Do you have an opinion that all such trucks
2  with a left foot brake design are defective, or is it
3  only related to this Crown truck?
4  A.  You asked me that before.
5  Q.  Okay.
6  A.  I said it depends on what their control
7  configuration is.
8  Q.  Okay.  And what about the control configuration in
9  this case allows you to come to the conclusion that the
10 left foot brake pedal here renders this design
11 defective?
12 A.  Because in the forks trailing direction of travel,
13 and the fact that you have an open -- we call it an open
14 back, it's actually the open front in this case.
15 Q.  Okay.
16 A.  You have no means to resist motion if you raise
17 your foot up off that brake pedal, other than trying to
18 lean the other way to compensate for it.  In other
19 words, your hands are occupied with other controls
20 related to the truck, which don't provide resistance to
21 the -- or enough resistance to forward motion, if you
22 try to stop by applying the emergency brake.
23 Q.  What control device is your left hand operating
24 during typical operation?
25 A.  The steering tiller.

Page 96

1  Q.  And it has a knob you can hold onto?
2  A.  Yes, sir.
3  Q.  Do you believe that provides stability?
4  A.  It could provide some, but it's not a fixed
5  object.
6  Q.  Okay.  It's on a limited plane, correct?
7  A.  Correct.
8  Q.  Have you seen a steering tiller in any other
9  machine or stand-up rider that you've evaluated, which
10 you believe provides more stability than the Crown
11 steering tiller?
12 A.  I think that they're generally the same.  So no, I
13 haven't looked at it for that specific aspect.  It's a
14 movable object and it's about a 10 inch diameter.
15 Q.  Okay.  The multiple function control?
16 A.  Yes, sir.
17 Q.  And what hand is that used with?
18 A.  Right.
19 Q.  And that governs what functions?
20 A.  Everything else, raise, lower, forks extend, side
21 shift, if it has it, reach.
22 Q.  And how does -- what are the planes in which that
23 device moves?
24 A.  It's moving two planes.
25 Q.  Okay.

1   A.   Generally in a circular direction.  It's not
2   constrained to forward, backward, side-to-side.
3   Q.   Up and down basically and then forward and
4   reverse?  And I agree it can move --
5   A.   Yes.
6   Q.   But it's meant to be operated up, down, back and
7   forth?
8   A.   Well, not totally up and down, but in those
9   planes, yes.
10  Q.   Okay.  Does any part of that control device allow
11  the operator to move towards the exit?  In other words,
12  holding onto that, does it give towards the rear entry,
13  or does it stay in a stable position that horizontal
14  plane?
15  A.   It depends on where his hand would be when they
16  started to move.
17  Q.   Okay.
18  A.   And his thumb is on the outside.  It depends on
19  where his hand would be when he started to move.
20  Q.   Okay.
21  A.   And his thumb is on the outside.
22  Q.   Right.
23  A.   So yes, it does.
24  Q.   Do you believe that the multi-function control
25  actually can be pulled towards the opening?

1   A.   No, I do not.
2   Q.   Okay.
3   A.   It can -- depending on where it is, it can move --
4   it's based on its actual movement.
5   Q.   In other words, if it's all the way up, it can
6   move and it would be a little closer to the other one?
7   A.   Correct.
8   Q.   Okay.  But say it's in a neutral position.  Can
9   that multi-function control be pulled towards the
10  opening?
11  A.   Physically?
12  Q.   Yes.
13  A.   No.
14  Q.   Okay.  Do you believe the multi-function control
15  provides a point of contact that provides stability to
16  an operator?
17  A.   I believe it provides a point of contact, not
18  necessarily stability.
19  Q.   What position is the operator of a Crown 5200
20  operator in during normal operation?
21  A.   Are you talking about orientation with respect to
22  the operation of the truck?
23  Q.   Yes.
24  A.   He's sideways.
25  Q.   Okay.

1   A.   Sideways with respect to the direction of travel.
2   Q.   Would you agree with me that there are many
3   designs of stand-up rider forklifts where the operator
4   is in a fore aft position?
5   A.   I would.
6   Q.   And when there is deceleration, there's no
7   backrest, in other words, the person can go towards the
8   open compartment, correct, the open end of the
9   compartment, when there's deceleration forks trailing?
10  A.   From a rearward prospective you're talking about?
11  Q.   Yeah.
12  A.   Correct, sideways on the --
13  Q.   Would you agree with me that the side stance
14  position provides a more stable environment than a fore
15  aft position, in terms of the design of the truck?
16  A.   Not necessarily.
17  Q.   Have you studied that, have you compared the
18  stability of an operator in a sideways position, side
19  stance position, versus an operator in a fore aft
20  position?
21  A.   Well, I mean, there are so many variables there.
22  If you have a five point contact, you have a five point
23  contact, irrespective of whether it's forward, reverse
24  or sideways.
25  Q.   Okay.

1   A.   And depending on how you stand.  You can be just
2   as stable in either orientation.
3   Q.   Would you agree with me that a fore aft position
4   when you're traveling forks trailing, you would only
5   have a four point -- four points of contact, not five?
6   A.   In what regard?  I wouldn't agree with that.  It
7   depends on how you stand.
8   Q.   Okay.
9   A.   If you're leaning up against the side of either
10  truck, you've got a five point stance.
11  Q.   Now, in terms of your opinion, you feel that the
12  brake pedal should be close to and operated by the right
13  foot?
14  A.   Right.
15  Q.   Okay.
16  A.   On this particular -- the point being it needs to
17  be on the side where there's a barrier as opposed to an
18  open.
19  Q.   Have you designed a stand-up rider forklift in a
20  preliminary manner, done drawings, which includes
21  exactly where you would put the brake pedal?
22  A.   No, I don't need to.  It's already been done.  In
23  fact, you guys have a pedal there already.
24  Q.   Okay.
25  A.   You just switched the switches.

Page 101

1    Q.   And again, my question is, as an engineer, is it
2    your opinion that Crown should just merely switch the
3    two pads, in other words, that's exactly where it should
4    be, where our right foot sensor pad is exactly where the
5    brake should be, and the left pedal should now be the
6    sensor pad, or have you come up with your own design
7    putting the right foot pedal in this particular location
8    of the truck?
9    A.   I have not come up with my own design, no. I
10   think where it's located generally is fine. If there
11   are some other issues which I haven't studied, I can't
12   imagine there being because Crown has obviously
13   researched where that pedal should be for other
14   functions.
15   Q.   Okay.
16   A.   So I would be of the opinion that its location is
17   fine.
18   Q.   Have you done any of your own drawings of an
19   operator compartment which show exactly where you feel
20   the pedal should be?
21   A.   No. I've provided several examples of where it's
22   already been done.
23   Q.   Have you prototyped it in any way?
24   A.   No. It's not necessary.
25   Q.   Have you done any of your own tests to determine

Page 102

1    any issues that may arise with the right foot pedal with
2    this orientation of operator?
3    A.   I operated another machine that had a right pedal
4    with that orientation of an operator.
5    Q.   Besides your personal operation, have you done any
6    tests with operators measuring forces or measuring any
7    other data?
8    A.   The forces would be the same.
9    Q.   Okay.
10   A.   It doesn't matter where the pedal is.
11   Q.   Have you done any such testing though?
12   A.   No.
13   Q.   Have you done any testing on an operator -- on a
14   truck with a right foot pedal configuration, as you
15   recommend, to compare the stability of that
16   configuration of pedal versus the stability in a
17   stand-up rider forklift designed as the Crown 5200
18   series is?
19   A.   Other than my own testing?
20   Q.   Yeah.
21   A.   Have I done any studies or tests?
22   Q.   Tests.
23   A.   No. My own would be the best gauge of that, based
24   on the different operating -- the different experience
25   characteristics on those two designs.

Page 103

1    Q.   Have you done any testing whatsoever where you
2    recorded data regarding an operator's stability in each
3    of those pedal configurations, so another engineer or
4    another scientist could compare the results of those
5    tests?
6    A.   Other than my videos, no. Another engineer could
7    compare those.
8    Q.   So you've done -- so you've videoed yourself -- I
9    shouldn't say that. Someone else videoed you operating
10   a Crown stand-up rider forklift?
11   A.   Yes.
12   Q.   And you also have videos of you operating a
13   Raymond truck?
14   A.   Prime Mover.
15   Q.   Prime Mover. And did the Prime Mover truck have
16   the right actuated brake?
17   A.   It did not.
18   Q.   In fact, the Prime Mover --
19   A.   I'm sorry. You asked me that question. It did
20   not. It had a left actuated brake.
21   Q.   So the Prime Mover truck has a left foot actuated
22   brake?
23   A.   With a different style of control, which has a
24   post that is rigid that you can hold onto.
25   Q.   So would your opinion be if Crown merely had a

Page 104

1    different control configuration with a rigid post, we
2    wouldn't need to move the brake pedal from the left to
3    the right?
4    A.   That's an alternative. I think the right actuated
5    pedal is better.
6    Q.   Even in the Prime Mover you'd rather have the
7    right actuated pedal?
8    A.   Well, there's a -- yeah, I think I would.
9    Q.   Okay.
10   A.   But I wouldn't consider theirs defective because
11   they have another means to provide stability when you
12   raise your foot up.
13   Q.   Okay. Do you think there's any safety concerns
14   with having your left foot not be tasked with the
15   function of keeping it down on a brake pedal, any safety
16   concerns you considered or analyzed in coming to your
17   opinion?
18   A.   Actually I think the fact that it's on the left
19   side when you step into the machine makes it a lot more
20   likely that you could accidently actuate the machine
21   before you're ready, because you're engaging it as you
22   step into the machine, versus if it's on the right side
23   you could put a foot down without doing that.
24   Q.   Okay.
25   A.   So I have analyzed that.

Page 105

1  Q.   Okay.  Do you find any safety issues, in your
2  opinion, which give you concern moving the left foot
3  brake pedal to the right side of the compartment?
4  A.   To the right side of the compartment.  I can't
5  think of any.  Let me put it this way.  I can't think of
6  any that would outweigh the benefits of putting it on
7  the right side.
8  Q.   Okay.  You state in your report that, It is
9  foreseeable to Crown that when the brake is applied at
10 typical travel speeds, the deceleration would have a
11 tendency to move the operator toward the opening?
12 A.   Absolutely.
13 Q.   Okay.  You've told us you haven't done your own
14 testing on that, in other words, you haven't put
15 accelerometers on operators to determine what the
16 deceleration is and what happens to that; is that
17 correct?
18 A.   That's correct.  But it's basic physics.
19 Q.   That's what I wanted to ask you.  What are you
20 relying upon?  You're relying on basic physics?
21 A.   First law of motion.
22 Q.   Okay.  Anything else, any specific articles,
23 studies or tests on this type of machine which you rely
24 upon for that statement?
25 A.   Well, my education and training as an engineer.

Page 106

1  It's intuitively obvious that when you have a person
2  standing on one leg, who is not prepared to move, then
3  they're going to move in the direction that they're
4  moving when that object tries to stop.
5  Q.   In regard to the left foot brake pedal versus the
6  right foot brake pedal, have you evaluated whether if
7  Crown just made that change, if that's all we did.
8  A.   Okay.
9  Q.   Would you believe that this truck would then be
10 reasonable and not defective?
11 A.   Irrespective of the door?
12 Q.   Yes, irrespective of the door.
13 A.   I would not opine that that is a defect.
14 Q.   You would not opine that the operator controls are
15 defective, irrespective of the door?
16 A.   Right.
17 Q.   If we just moved it to the right side?
18 A.   Correct.
19 Q.   Do you have an opinion regarding whether or not
20 that change would have prevented this accident from
21 occurring?
22 A.   My opinion, with a reasonable degree of
23 engineering certainty, is that it would, it would have.
24 Q.   And I want to know everything that's based on?
25 A.   Well, first of all, he's raising a foot that is

Page 107

1  inboard, which would cause him to lean in a direction
2  that would counteract the deceleration, for one.
3  Q.   Okay.
4  A.   And the fact that his leg went out is either
5  involuntary or in response to trying to brace himself,
6  which he would not need to do if it was on the right
7  side.  Do you want to get into the steering enabling
8  function?
9  Q.   We'll get into that next.
10 A.   Okay.  No.  I think absolutely it would have
11 prevented the accident.  More likely than not, it would
12 have prevented this accident.
13 Q.   Would you agree with me that it is plausible that
14 he could have, for whatever reason, voluntarily stuck
15 his foot outside of the compartment, whether it was a
16 panic reaction or an attempt to push off from the object
17 he was hitting, that is a plausible potential
18 alternative?
19 A.   I would not agree with that in this case.
20 Q.   Okay.
21 A.   Because I think if you're going to stick your foot
22 out, it's going to be above the skirt, because you're
23 going to try to stop yourself up higher than down low.
24 Q.   Okay.
25 A.   In fact, his testimony was that he didn't even

Page 108

1  know he crushed it until he tried to move it.  And he
2  was stuck between the curb and the skirt of the machine.
3  Q.   And even at the front edge of the truck?
4  A.   Say again?
5  Q.   Do you know where his foot ended up in relation to
6  the truck, have you done that analysis?
7  A.   In relation to the truck?
8  Q.   Yes.
9  A.   Generally the front edge, the front.
10 Q.   Okay.
11 A.   And near where the radius on the curb started down
12 the aisle.
13 Q.   Okay.  Were you asked to reconstruct this
14 accident?
15 A.   I was not.
16 Q.   Okay.
17 A.   But you only got a 12 inch curb.  I think it's
18 implausible that you would actually put your foot down
19 to try to stop against that curb if you're trying to
20 stop the machine.  I think it's 12 inches.  It's
21 somewhere around there.
22 Q.   You measured this?
23 A.   I can look to tell you exactly.
24 Q.   Okay.
25 A.   Actually the curb height is only 6 inches.  So

## Page 109

1    it's a very short curb.
2    Q.    Okay.
3    A.    It makes it even more impossible.
4    Q.    Now, in your report you list Raymond, Toyota and
5    Heister as having designs of compartments with right
6    foot brakes?
7    A.    Yes, sir.
8    Q.    Would you agree with me that Raymond, Toyota and
9    Heister also make stand-up rider forklifts with left
10   foot actuated brakes?
11   A.    I think they do.
12   Q.    Have you evaluated any of those trucks to
13   determine whether you believe any Raymond, Toyota and
14   Heister left foot pedal manufactured trucks are
15   defective?
16   A.    I have not, because I haven't looked at the
17   control configurations.
18   Q.    Okay.
19   A.    Or the operator containment design on those
20   particular trucks.
21   Q.    The exemplar truck that you have in figure 10 in
22   your report, would you agree with me that it only has
23   one pedal, in other words, there's no --
24   A.    I would.  Well, if you look at yours, it looks
25   like it only has one pedal too because it's under the

## Page 110

1    pad.
2    Q.    Is there also a ridge in the Crown?
3    A.    Pardon me?
4    Q.    Is there a ridge between the -- where the feet are
5    placed in the Crown 5200 series truck?
6    A.    A ridge?
7    Q.    Yes.  So operators can determine --
8    A.    I don't recall it being a distinct ridge, but
9    there may be.  I don't think so.  If you look on page 7.
10   Q.    Behind the brake button or brake pedal, do you see
11   that ridge area?
12   A.    You're talking about the -- you're talking about
13   the piece of steel?
14   Q.    Yes.
15   A.    Okay.  I wouldn't call that a ridge.  I'd call
16   that part of the pedal configuration.
17   Q.    Do you know why that is designed there?
18   A.    I think that's the pivot point for the pedal.  But
19   I'll go with ridge, but I don't know if I'd call it a
20   ridge.  A ridge would go all the way across.
21   Q.    Do you know why that elevated metal strip, we'll
22   call it that, that goes in the middle of the
23   compartment, do you why that was designed to be there?
24   A.    I do not.
25   Q.    And just so I'm clear.  Have you in any way,

## Page 111

1    whether it's a drawing, a model, a prototype, have you
2    designed the floor board of a compartment yourself, and
3    I know it would be a mock-up, that we can evaluate to
4    determine precisely where you would put the pedals, how
5    it would be designed, things of that nature?
6    A.    No.  I told you I would defer to how it's already
7    done.
8    Q.    Okay.
9    A.    And how everybody -- everybody else has already
10   done it.
11   Q.    Okay.  And is there any specific truck, when you
12   say that, would you -- is there a specific truck you can
13   point me to say the John Deere X Caliber 3 has the
14   floorboard that I recommend that should be on the Crown
15   5200?
16   A.    No.  I provided several examples that in my mind
17   would be sufficient.
18   Q.    Okay.  But would you agree with me you're pulling
19   portions of each one?  I'm just asking you can you point
20   to one, whether it's a Raymond, whether it's a Heister,
21   that you would say this floorboard configuration is the
22   one that Mr. Rasnic recommends that Crown should have
23   used on the 5200 series forklift?
24   A.    Again, I think I've answered that.  I've given you
25   several examples, and I said that swapping your pedals

## Page 112

1    around, in my mind, would be sufficient, because
2    obviously the pedal that's already there has been
3    researched in terms of its location.
4    Q.    Besides Crown just swapping its pedals, is there
5    any other specific truck, and if you tell me it's the
6    exemplar Raymond that you would recommend, I'll accept
7    that?
8    A.    The location in all these other ones, in my mind,
9    would suffice for addressing what the defect is in this
10   case.
11   Q.    Okay.  On any of these other models that you've
12   evaluated, have you done field testing with operators to
13   measure their stability, to measure forces, to measure
14   their comfort and other things to determine if that is a
15   design you would recommend?
16   A.    Forces, accelerations and all those are going to
17   be the same, it doesn't make any difference.  Comfort I
18   have not evaluated.
19   Q.    Have you measured any of those other things,
20   acceleration forces?
21   A.    No, I don't need to.
22   Q.    Okay.  You mentioned the military standard on page
23   14 of your report.
24   A.    Yes, sir.
25   Q.    And you considered that?

Page 113

1  A.  I did.
2  Q.  And the military standard requires that stand-up
3  rider forklifts have a left foot brake?
4  A.  Yes, sir.
5  Q.  Do you know why though?
6  A.  I didn't read the military standard.  No, I
7  didn't.
8  Q.  How did you determine without reading it that it
9  had that requirement?
10  A.  From your responses.
11  Q.  Okay.  Have you ever looked at any military
12  standard regarding stand-up rider forklifts?
13  A.  I don't think so.
14  Q.  Okay.  Have you seen any reference or materials
15  that describe for you why they feel that, from a
16  military standpoint, it's used in military situations
17  that --
18  A.  I've looked at military standards before.
19  Q.  Have you reviewed any materials which explain or
20  describe why the military specifications require a left
21  foot brake pedal?
22  A.  No.  It's immaterial.  It's a military standard,
23  it's not an industrial standard.
24  Q.  Okay.  Would you agree with me that the military
25  is a large purchaser of material handling equipment?

Page 114

1  A.  In relation to who, the rest of the world?
2  Q.  I would say -- would you agree with me the
3  military and U.S. military operations use material
4  handling equipment in military warehouses and
5  distribution centers throughout the country?
6  A.  I would.
7  Q.  In other words, these are not used on battle
8  fields or only in Afghanistan, these military
9  specifications apply to trucks that are used in the
10  United States to move material within warehouses?
11  A.  They do.
12  Q.  Okay.  Before I go on to the sensor pad, we've
13  raised the door issue a couple of times.
14  A.  Right.
15  Q.  Have you or do you intend to offer an opinion
16  whether a Crown stand-up rider forklift must be equipped
17  with the operator compartment door or -- bad question
18  again.
19     Do you intend to offer an opinion at trial of this
20  matter regarding whether or not an operator compartment
21  door should be standard on Crown stand-up rider
22  forklifts?
23  A.  I would defer to the other experts for that
24  opinion.  I would agree with them, but I wouldn't offer
25  the opinion.

Page 115

1  Q.  Okay.
2  A.  I think it makes it a safer machine.  They've done
3  a lot of analysis, more than I have, so I'll defer to
4  them.
5  Q.  Do you intend to offer that opinion at trial?
6  A.  What opinion?
7  Q.  That the door would make it a safer design?
8  A.  I will defer to them on the opinions.
9  Q.  For instance, have you done your own safety
10  analysis of the issue?
11  A.  No, other than reading their reports, I haven't.
12  Q.  Have you reviewed any injury potential testing
13  regarding forklifts with doors?
14  A.  No.
15  Q.  Have you done any testing yourself on that issue?
16  A.  On doors, no, sir.
17  Q.  Okay.  Have you ever designed, built or prototyped
18  any type of door?
19  A.  For a forklift or others?
20  Q.  For a forklift.
21  A.  No.
22  Q.  Okay.
23  A.  I'm sorry.  I have walkie forklifts, but that's
24  not what you're talking about though.
25  Q.  Correct.

Page 116

1  A.  Okay.
2  Q.  Stand-up rider forklifts such as that you've
3  evaluated in this case?
4  A.  Thank you.  I have not.
5  Q.  You've received reports.  Have you received any
6  reports from experts retained by Crown Equipment
7  Corporation?
8  A.  Not that I know of.
9  Q.  When you say you would defer to these others, did
10  you have any prior relationship with Mr. Berry?
11  A.  No, sir.
12  Q.  Have you ever met Mr. Berry?
13  A.  Prior to the inspection?
14  Q.  Yes.
15  A.  I may have been involved with him in another case,
16  but I don't remember it specifically.  I seem to
17  recognize his name.
18  Q.  Do you know enough about him from your engineering
19  dealings, that you would just naturally defer to him as
20  someone that you have spent a lot of time with, and know
21  his credentials and accept them?
22  A.  I have not.
23  Q.  How about Mr. Mark Elrod, have you ever met him
24  before this case?
25  A.  No, I have not, not that I'm aware of anyway.

Page 117

1   Q.   And Mr. Kennett, have you dealt with him in the
2   past?
3   A.   I don't think so.  Understand that there are a lot
4   of cases that I go to where there are a lot of experts
5   there.
6   Q.   Sure.
7   A.   And he may have been there, but I don't recall him
8   specifically.
9   Q.   And that's what I'm trying to figure out.  Is
10   there anything in particular about those individuals
11   which would make you defer to them because of prior
12   experience and knowledge of their qualifications and
13   credentials or their engineering acumen?
14   A.   No, sir.
15   Q.   Now, you also rendered an opinion regarding the
16   sensor pad, which is under the right foot of the Crown
17   design, correct?
18   A.   Yes, sir.
19   Q.   And I believe you state in your report that you
20   feel this should be switched to the left side?
21   A.   Did I say that in the report?
22   Q.   You did.
23   A.   I said that to you in my --
24   Q.   You did.  Maybe I'm confusing myself.
25   A.   Okay.  Well, no.  I think I talked about it in

Page 118

1   terms of the fact that it contributed to the accident by
2   causing it to lose steering.
3   Q.   And you feel the pad should be larger?
4   A.   Did I say that?
5   Q.   Yes.
6   A.   What page?
7   Q.   You said it on page 13, actually 14 is where you
8   say that, middle of the page.  A simple fix for this
9   issue, that would not affect the utility of the machine,
10   is to simply make the sensor pad larger and more
11   sensitive so that it stays engaged and enables steering
12   except when the operator actually intends to release it.
13   Do you see that?
14   A.   What page?
15   Q.   Page 16.
16   A.   Okay.  You put it in the context of larger and
17   more sensitive.  That's what was throwing me.  I don't
18   remember saying just specifically larger so.
19   Q.   Okay.
20   A.   I'm with you now.
21   Q.   And do you have an opinion whether that sensor pad
22   should be under the right foot or the left foot?
23   A.   Well, in this design it would be better for it to
24   be under the left foot, based on the brake issues.  I'm
25   still trying to get my hands around why it's necessary

Page 119

1   to disable steering with a sensor pad.
2   Q.   Okay.
3   A.   In many other designs it's activated by the key
4   switch.
5   Q.   Just so I'm clear.  Your evaluation of this
6   machine is that when an operator is not in contact with
7   the sensor pad, if they raise their foot for whatever
8   reason.
9   A.   Right.
10   Q.   That disables power to the steering?
11   A.   Yes, sir, the power steering pump, correct.
12   Q.   And what did you evaluate to come to that opinion?
13   A.   The manuals, the service manual and operator's
14   manual.
15   Q.   Do you recall a portion of that where it says that
16   in the service and parts manual?  Here's the entire
17   manual.
18   A.   Okay.
19   Q.   And by the way, and just for the record, the one
20   thing I did not identify that you brought, which I will
21   not mark as an exhibit, is the Crown Service and Parts
22   Manual.  And you seem to have a real one.  Did you get
23   this from Hugg and Hall?
24   A.   I bought it, yeah.
25   Q.   Bought it.  Is there a portion of the service

Page 120

1   manual that you rely upon for your opinion that when an
2   operator is not in contact with the sensor pad, that
3   disables power to the steering mechanism?
4   A.   Yeah.  I wish I had marked it in here.  Somewhere
5   in here it says that.
6   Q.   Okay.
7   A.   I believe switch P1, which is the lift, steering
8   and accessory hydraulic pump, which is to provide
9   hydraulic flow to operate steering is actuated by DMS1
10   interlock switch, which is located under the floorboard
11   right pedal.
12   Q.   Okay.  When an operator disengages from that pedal
13   what happens?
14   A.   It's a continuous contact switch.  It disables the
15   pump and prevents you from steering.
16   Q.   And you believe that's a design defect?
17   A.   I can't think of a reason why you would want to
18   disable with the pedal.  When you turn the truck key on
19   you want to operate the truck.  I can't imagine why you
20   would want the steering to be operative all the time.
21   So yeah, that's a defect.
22   Q.   And in terms of the function of the switch and how
23   it operates, are you relying upon the service manual for
24   how that works, or have you done anything else?  In
25   other words, when you inspected this did you see how the

Page 121

1   switch worked?
2   A.   I did not test for that, no, at the inspection.
3   In fact, my focus was different in the inspection.
4   Q.   Okay.
5   A.   I don't believe Mr. Hernandez had been deposed at
6   that time either.
7   Q.   So the entirety of that opinion is based on how
8   that function is described in the service and parts
9   manual?
10  A.   Yes, sir.
11  Q.   Okay.
12  A.   I believe it's described similarly in the
13  operator's manual.
14  Q.   And you believe the truck should be designed to --
15  do you believe the truck should be designed that if an
16  operator takes their foot off the sensor pad, whether
17  it's on the right or the left, that they should continue
18  to have the ability to power steer or use power steering
19  in their functions?
20  A.   I do.  In fact, there are many truck designs, and
21  we mentioned -- you mentioned this earlier, that only
22  have one pedal.
23  Q.   Okay.
24  A.   And that exclusively controls only the braking
25  function.  It doesn't enable any of the other controls.

Page 122

1   That's what you do with the key switch.
2   Q.   And if Crown designed a pad where say the operator
3   would take his foot off, and he or she would continue to
4   have plugging, steering, electrical functions, that
5   would satisfy your design concern in this situation?
6   A.   Yes, sir.
7   Q.   Now, do you believe in this particular case
8   that -- you talked about you want the sensor pad more
9   sensitive and larger in your report?
10  A.   I mention two things in my report, one is the
11  intermittent fall possibility.
12  Q.   Okay.
13  A.   There doesn't seem to be anything to back up, in
14  terms of the records at least, while it's intermittent,
15  it may not be able to find it.  If it is that sensitive,
16  that a slight movement of the foot would cause it to
17  disengage, then larger and more sensitive would make it
18  a better design.
19  Q.   Have you designed, have drawings, prototyped,
20  mock-up, or modeled, or developed a model for this
21  larger more sensitive pad in any form?
22  A.   No.  Again, it's intuitive.  I've
23  developed many switch engagement mechanisms in my
24  career.  In terms of sensitivity, it's all a function of
25  the type of switch you use and how you set it.  So it's

Page 123

1   not unique science.
2   Q.   But in this particular case --
3   A.   I have not made a prototype, no.
4   Q.   Okay.  Now, from your review of materials and your
5   analysis of the testimony in this case, have you seen
6   any support that this truck experienced an intermittent
7   failure which led to a loss of power?
8   A.   Unless it was on that particular accident day, no.
9   There's no invoices or work orders that show this
10  problem occurring that I could find, prior to this
11  accident.
12  Q.   Do you know what happens to a Crown 5200 series
13  forklift if there is a failure of power steering for
14  traction, do you know what happens to the truck?
15  A.   Well, other than the obvious, it won't steer and
16  you can't make it move either direction.
17  Q.   But does it shut itself down, does it continue to
18  allow the operator to accelerate?
19  A.   Your question, again, you're talking about the
20  right sensor pad?
21  Q.   Yes.
22  A.   I lost your question in that explanation.
23  Q.   You talked about a potential intermittent
24  failure --
25  A.   Right.

Page 124

1   Q.   -- of some power function?
2   A.   Correct.
3   Q.   Do you know how this truck is designed to address
4   any failures or disturbances in an electrical function,
5   does it continue to operate otherwise, does it shut
6   down, or what does it do?
7   A.   There are too many unknowns to tell you what
8   it does every time.  I think it depends on the
9   circumstance.  If you blew -- if you blow a fuse it
10  will -- if you don't blow a fuse it could shut down.  It
11  depends on the type of fault.  I can't answer that
12  question.
13  Q.   Say an operator loses the ability to plug.
14  A.   Okay.
15  Q.   If something happens where there's a malfunction
16  of the plugging, do you know what would happen to the
17  operation of this truck?
18  A.   It would decelerate.  After that you mean?
19  Q.   What would the truck do?
20  A.   It depends on the type of fault.
21  Q.   Do you know whether or not it would display a
22  fault code?
23  A.   It might, depending on how it's -- depending on
24  the type of fault it had, if that's picked up by the
25  control.

Page 125

1    Q.   Do you know whether or not any fault codes were
2    displayed here?
3    A.   There were not when we looked at it.
4    Q.   Okay.  Do you know if any were determined at the
5    time?
6    A.   They were not.
7    Q.   Okay.  In other words, it was looked at and there
8    were no fault codes that were shown at the time of the
9    accident?
10    A.   I'm not sure that -- my recollection from talking
11    with mechanics, is that they just find the fault code
12    and fix it, and they don't record the fault code.
13    Q.   Okay.
14    A.   Or something to that effect during the inspection.
15    Q.   But after this accident, did anyone find a fault
16    code that you're aware of?
17    A.   I don't have any work orders of anything that
18    would tell that, that happened after the accident.
19    Q.   Now, you also have an opinion regarding the -- let
20    me ask you now what I was going to ask earlier.  In
21    terms of the sensor pad, you've told us you don't have
22    evidence of an intermittent failure.  And I'm just
23    trying to get a hand on your opinion.  Will you testify
24    that if this sensor pad would have been larger and more
25    sensitive, that that design change would have prevented

Page 126

1    this accident?
2    A.   In its location that it's in now?
3    Q.   Yes.
4    A.   If it was larger and more sensitive, that's my
5    opinion, yeah.
6    Q.   Okay.
7    A.   Because I don't think it was an intermittent fault
8    because I don't have any evidence of that.
9    Q.   Okay.  So let me break that down a little.  You
10    don't feel it was an intermittent fault here because you
11    don't have any evidence of that?
12    A.   Correct.
13    Q.   So you feel that the disengagement from the sensor
14    pad contributed to the happening of this accident?
15    A.   Exactly.
16    Q.   So that was correct?
17    A.   Yes, sir.
18    Q.   In your report you kind of say you don't -- bad
19    question again.
20        So you feel in this case that an explanation for
21    why he lost steering is, for whatever reason, he
22    disengaged from the power on pad on the right foot, and
23    that caused a loss of steering and ability to control
24    the truck?
25    A.   Yes, sir.  In the -- in the absence of any other

Page 127

1    information about a fault of some sort.
2    Q.   Okay.  And to that point, in this case you don't
3    have any information which would support an opinion that
4    this was an intermittent failure of the power system?
5    A.   I don't one way or the other, that's correct.
6    Q.   Okay.  You then also talk about the backrest
7    feature?
8    A.   Yes, sir.
9    Q.   And I believe you opine that the operator backrest
10    should be extended into the opening more?
11    A.   Or the pad style changed.  It's very -- it's like
12    a slope right now.
13    Q.   Okay.
14    A.   So there's really no resistance to somebody
15    sliding on the pad.
16    Q.   And regarding the operator backrest, have you
17    completed design drawings, built, prototyped or done a
18    model of the operator backrest that you would recommend
19    on the Crown 5200 series forklift?
20    A.   I think I said in the absence of a door, I
21    believe.
22    Q.   Okay.
23    A.   No.  I have my experience with the Prime Mover one
24    that resisted my movement better than the Crown would.
25    Q.   And is that your opinion, that Crown should adopt

Page 128

1    the backrest on the Prime Mover, or that's what I'm
2    trying to figure out?  Are you going to say at trial
3    that the Prime Mover, that backrest is exactly what I
4    think Crown should have done on the 5200?
5    A.   Actually I'm trying to give you several ways that
6    you could address this accident.
7    Q.   Okay.
8    A.   If you're not going to do -- I prefer the pedal,
9    but the door obviously is the best way.
10    Q.   Okay.
11    A.   Movement of the pedal, if you have the pedal
12    moved, then you may not need to do anything to the
13    backrest.  If you're not going to do it that way, you're
14    going to leave the pedal where it is and leave the
15    controls the way they are, and leave the door off, then
16    you should provide a better backrest wrap to provide
17    some resistance to rearward motion, if you're not going
18    to do all the rest of them or any of the rest of them.
19    Q.   And have you done any testing, stability testing,
20    scientific testing on a stand-up rider forklift with
21    this extended backrest, to determine the stability it
22    provides compared to the stability in a Crown stand-up
23    rider forklift with the backrest as it exists?
24    A.   Only with regard to the Prime Mover.  I haven't
25    done it independent of that.

Page 129

1    Q.   And that was your operation?
2    A.   Yes, sir.
3    Q.   Have you done any testing which gives us any data
4    points, any measurements that we can evaluate to
5    determine the stability of that compartment versus the
6    Crown compartment you're comparing it to?
7    A.   No, I have not.
8    Q.   Do you have an opinion regarding if Crown would
9    have extended the backrest, whether or not that would
10   have prevented Mr. Hernandez's accident?
11   A.   If there is a backrest that provided resistance to
12   rearward motion, then it would have prevented the
13   accident.
14   Q.   Can you just tell me how much farther it should be
15   extended then?
16   A.   I'm not necessarily advocating the extension.  I'm
17   advocating more of something that would give the
18   operator something to catch against, as opposed to just
19   a flat surface that allows them to slide right out.
20   Q.   Any dimensions you can give me, whether it's cut
21   out this, extend it, make it deeper in the compartment,
22   anything you can give me now, as you sit here, to
23   support the --
24   A.   What I would have in mind, sitting here as we're
25   talking, is where the current backrest terminates,

Page 130

1    putting another pad on there that has a step on it.  So
2    that if you slide against that, you're at least provided
3    some resistance so that you don't go out the back of the
4    machine.
5    Q.   Okay.
6    A.   And that essentially would be just a rectangular
7    pad that would sit next to the other one.  And it could
8    be incorporated inside or mostly inside the resisting
9    pad footprint.
10   Q.   And again, do you have any drawings, prototypes or
11   models of that?
12   A.   No.
13   Q.   The control configuration, in your report on page
14   17 you identify -- you photograph a Prime Mover RDX 30
15   Speed Direction Control Joystick and Handrest?
16   A.   Correct.
17   Q.   And do you feel that Crown's control configuration
18   with the steering tiller and the multi-function control
19   is defective and unreasonably dangerous?
20   A.   That in itself?
21   Q.   Yes.
22   A.   I do not.
23   Q.   Do you recommend that Crown install a handrest and
24   joystick as identified in figure 11 on Crown 5200 series
25   stand-up forklifts?

Page 131

1    A.   I'm not advocating one or the other.  I don't have
2    a problem with their controls, I have a problem with
3    their controls in conjunction with the other items I've
4    already discussed.
5    Q.   Okay.
6    A.   All I'm showing here is that there is an alternate
7    control configuration which provides more resistance to
8    deceleration forces with an open back machine.
9    Q.   And on that point, have you done any studies or
10   tests to compare the stability of the operator controls
11   on the Prime Mover RDX 30 compared to the Crown 5200
12   series control configuration?
13   A.   I think your question is not correct.  Stability
14   of the control is not really what you want, it's the
15   stability of an operator using those type of controls, I
16   think.
17   Q.   Correct.  I'll start again.
18   A.   Okay.
19   Q.   Have you done any tests or studies with recorded
20   data, information another engineer could process,
21   comparing the operator's stability in a compartment with
22   the control configuration of the Prime Mover setup
23   compared to the Crown 5200 control configuration?
24   A.   An engineer could process the difference in these
25   designs, in terms of the fact that you hold onto this

Page 132

1    pad versus you don't on the -- you hold onto a movable
2    handle on the Crown design.
3    Q.   Okay.
4    A.   My testing is my operation of the machine in
5    similar circumstances of hard braking with the emergency
6    brake.
7    Q.   Other than your operation of the machine, have you
8    done any testing that provided recordable data results,
9    data from accelerometers, et cetera, that recorded the
10   stability or the accelerations one would experience in
11   the Prime Mover type control configuration versus the
12   Crown 5200 control configuration?
13   A.   No accelerometer, no.
14   Q.   Any recorded data whatsoever?
15   A.   No.
16   Q.   Okay.
17   A.   Again, it would be intuitively obvious to an
18   engineer regarding the stability differences with regard
19   to this design and the other one.
20   Q.   And if I'm looking at the joystick and handrest on
21   figure 11, so I understand it.
22   A.   Okay.
23   Q.   The top of that joystick, what is the curved
24   out -- what do you put there?
25   A.   Your thumb.

33 (Pages 129 to 132)

Page 133

1   Q.   And you put your hand around the other?
2   A.   Yes, sir.
3   Q.   And would you agree with me that your hand can
4   slide sideways, there's nothing stopping it, in other
5   words?
6   A.   Well, your thumb is down below the side, the left
7   side of the pad.  So could it slide, not likely.  Hand
8   sliding is going to be in the direction perpendicular to
9   the direction of travel.  You can slide it to different
10  positions on there, that's correct.
11  Q.   Is this a side stance operated machine?
12  A.   It is.
13  Q.   Fore aft?
14  A.   Yes.
15  Q.   It's a side stance?
16  A.   Yes, sir.
17  Q.   Okay.  And what is the -- what is that handrest
18  made of, what is the friction device, is that leather,
19  is it plastic, is it --
20  A.   It felt like hard rubber, or not really a hard
21  rubber, more of a soft rubber pad to me.
22  Q.   If Crown would have had that control
23  configuration, as opposed to the one we have in our
24  5200, do you believe that would have prevented
25  Mr. Hernandez's accident?

Page 134

1   A.   I do.
2   Q.   Okay.  And what is that based on?
3   A.   Based on again physics and my personal operation
4   of both designs.
5   Q.   Okay.  Anything else?
6   A.   No, sir.  Well, my knowledge, education and
7   training.
8   Q.   And last, and you correct me if I'm wrong, in
9   reading your statement, you also say that Crown did not
10  provide any personal protective equipment with the truck
11  to reduce the severity of this hazard?
12  A.   Correct.
13  Q.   Do you have an opinion -- I didn't get this one,
14  so I'm just going to ask you.  Do you have an opinion
15  that Crown should have required or recommended to
16  operators that they wear some personal protective
17  equipment when they operate a Crown stand-up rider?
18  A.   No.  All I was trying to do there was tie it back
19  to the design hierarchy.
20  Q.   So you won't be coming to trial and saying, Crown
21  should have issued steel-toed shoes?
22  A.   That wouldn't have made any difference.
23  Q.   Okay.
24  A.   No, I will not.
25  Q.   Okay.  You also address in your report Crown's

Page 135

1   warnings.  I want to just get a handle on those.
2   A.   Okay.
3   Q.   Do you feel that Crown's warnings were in any way
4   defective or unreasonable?
5   A.   Let me get to the warnings part.
6   Q.   I don't see a lot on it, but you mentioned it in
7   your design hierarchy.  And I'm just trying to figure
8   out if you're going to come to trial and say here's what
9   warnings I recommend and Crown didn't do it?
10  A.   No.  The only point of this is that there is a --
11  there are design priorities related to safety
12  effectiveness that are available, that were not
13  followed.  And warnings was not -- it's the third most
14  effective.  I would never advocate that over a design
15  change or a guard.
16  Q.   Will you come to trial and say, Crown's warnings
17  in this case were defective and inadequate?
18  A.   That's not my intention.  My only point of putting
19  that in the report is that if you're not going to design
20  the hazard out, or if you're not going to guard against
21  the hazard, then you should provide very explicit
22  warning language to alert the operator to this potential
23  hazard.  I haven't thought about what that warning would
24  say, but generally along those lines.  It needs to be
25  something that's highlighted.

Page 136

1       Now, the reason warnings are not generally
2   effective is they either become numb to the warning, or
3   the operators don't read them or they don't understand
4   them.  That's why I wouldn't advocate that over the
5   other two.
6   Q.   Have you developed any candidate warnings or
7   alternative warnings that you intend to offer in this
8   case?
9   A.   No.
10  Q.   Okay.  If Crown would have had a different set of
11  warnings, do you believe it would have prevented this
12  accident?
13  A.   I think I'll give you a maybe on that.  Again, it
14  depends on whether it's read and understood and heeded.
15  That's the problem with warnings.
16  Q.   Do you have an opinion, to a reasonable degree of
17  engineering certainty, that if Crown would have said,
18  when you decelerate you may experience some forces that
19  disturb your balance, be careful?
20  A.   Do I think if it had that nature of warning that
21  it would have prevented the accident, I can't say that
22  with a reasonable degree of engineering certainty.
23  Q.   Okay.  And you also talk about training in your
24  hierarchy.  I just want to determine.  Have you been
25  asked to offer any opinions regarding Mr. Hernandez's

Page 137

1    specific training in this case?
2    A.   No.
3    Q.   Have you been asked to offer any opinions
4    regarding the adequacy or inadequacy of Crown's training
5    materials that can be used by employers?
6    A.   No, sir.
7    Q.   Would you agree with me that stand-up rider
8    forklifts are used in many different functions
9    throughout distribution centers and warehouses across
10   this country?
11   A.   I would.
12   Q.   That they can be used around docks?
13   A.   Yes.
14   Q.   They can be used around racks?
15   A.   Yes.
16   Q.   Would you agree with me that stand-up rider
17   forklifts can in certain situations go off docks and
18   result in accidents in that regard?
19   A.   I can agree with that.
20   Q.   They also can become involved in tipovers?
21   A.   They can.
22   Q.   Will you agree with me that off the dock accidents
23   present a life threatening injury potential to an
24   operator of a stand-up forklift?
25   A.   They can.

Page 138

1    Q.   And with a tipover, would you agree with me that
2    if an operator is involved in a tipover accident, that
3    presents a life threatening injury potential to that
4    operator?
5    A.   It can.
6    Q.   Would you agree with me that off the dock
7    accidents can occur in a split second?
8    A.   I think that any accident can occur in a split
9    second.
10   Q.   So that would include off the dock accidents?
11   A.   Sure.
12   Q.   Tipover accidents can occur in a split second?
13   A.   Well, split second is kind of a subjective term.
14   Q.   Very, very short period of time?
15   A.   They can depending on the speed.
16   Q.   In terms of your statement on the door issue.  Do
17   you feel as an engineer you have evaluated that issue
18   sufficiently to allow you to come to court and render an
19   opinion, to a reasonable degree of engineering
20   certainty, whether or not stand-up riders should be
21   equipped with doors?
22   A.   Have I personally.  No, I have not.
23   Q.   Okay.
24        MR. CULLEN:  Why don't we take five
25        minutes.

Page 139

1    A.   Okay.
2         MR. WARSHAUER:  Okay.
3         (A recess was had.)
4    BY MR. CULLEN (CONT.):
5    Q.   Just a few additional questions.  The Prime Mover
6    truck, starting with that that we looked at in your
7    report on page 17.  You told us you operated that truck.
8    Did you do it in conjunction with this case?
9    A.   No, another case.
10   Q.   And when was that?
11   A.   I would say late last year.
12   Q.   Okay.
13   A.   Probably in the October November time frame.
14   Q.   Okay.  It was after you inspected the Crown truck?
15   A.   Yes, sir.
16   Q.   So in November or December of 2013, you operated
17   the Prime Mover truck in conjunction with another legal
18   matter?
19   A.   Yes, sir.
20   Q.   And in that case did you have design opinions
21   regarding the Prime Mover truck?
22   A.   I did not.
23   Q.   Okay.  Was it --
24   A.   That case is -- I'm not to an opinions point on it
25   yet.

Page 140

1    Q.   Okay.
2    A.   But I don't anticipate that I will.
3    Q.   Okay.  So on that case where you operated the
4    Prime Mover, you haven't finally evaluated what your
5    opinions will be in that case in the design or the
6    construction process?
7    A.   Correct.
8    Q.   Okay.  Is it a lower left leg injury?
9    A.   Say it again?
10   Q.   Is it a lower left leg injury?
11   A.   No, it is not.
12   Q.   Okay.
13   A.   Well, let me think about that.  I don't recall the
14   injury.  I don't think it is.
15   Q.   Do you know the accident scenario?
16   A.   I don't remember.
17   Q.   A tipover?
18   A.   Not a tipover.  It was -- it was a collision of
19   some sort.  I don't think it was -- I think it was an
20   upper body injury.
21   Q.   Okay.  Have you operated the Prime Mover truck
22   since I guess your evaluation and your inspection in
23   that legal matter?
24   A.   I'm not following you.
25   Q.   Have you operated a Prime Mover stand-up rider

Page 141

```
 1   truck, simular to or identical to that truck, since your
 2   inspection and your evaluation in that legal matter?
 3   A.   No, sir.
 4   Q.   Okay.
 5   A.   Are you talking about an exemplar in addition to
 6   this one?
 7   Q.   Yes.
 8   A.   Okay.  No, I have not.
 9   Q.   The Raymond truck that you photographed on page
10   14.
11   A.   Yes, sir.
12   Q.   Is that a -- first of all, it's a stand-up rider
13   forklift, correct?
14   A.   Page 14?
15   Q.   Yes.
16   A.   It is a stand-up rider, yes, sir.
17   Q.   And did you evaluate that truck in connection with
18   a legal matter?
19   A.   Yes, sir.
20   Q.   And --
21   A.   It was in anticipation of a legal matter.  And I
22   didn't find any problem with it, so the matter is done
23   now.
24   Q.   Okay.  So this was a Raymond stand-up rider truck?
25   A.   Yes.
```

Page 142

```
 1   Q.   Do you know what type of accident was involved,
 2   was it a tipover?
 3   A.   It was a collision with a rack.  I do remember
 4   that one.
 5   Q.   Okay.  This Raymond truck had an open compartment
 6   design?
 7   A.   It did.
 8   Q.   Did you find any design defects with the Raymond
 9   truck?
10   A.   I did not.
11   Q.   And when did you evaluate this truck, when did you
12   look at this truck?
13   A.   Several years ago.  Probably four or five at
14   least.
15   Q.   The Prime Mover stand-up rider that you evaluated,
16   did it have the open compartment design?
17   A.   It did.
18   Q.   Besides what we have gone through today now, and
19   I've added the service and parts manual, have you
20   reviewed, analyzed or evaluated any other materials in
21   coming to or forming your opinions in this matter?
22   A.   No, sir.
23        MR. CULLEN:  I have no further questions.
24   A.   Thank you.
25        MR. WARSHAUER:  Thank you.
```

Page 143

```
 1        (WHEREUPON, the above-entitled deposition
 2   was concluded at 12:35 p.m..)
 3             * * * * * * *
```

Page 144

```
           C E R T I F I C A T E

STATE OF ARKANSAS*
               ss  *
COUNTY OF SALINE *

     I, JEFF BENNETT, Certified Court Reporter, a
Notary Public in and for the aforesaid county and state,
do hereby certify that the witness, RUSS RASNIC, was
duly sworn by me prior to the taking of testimony as to
the truth of the matters attested to and contained
therein; that the testimony of said witness was taken by
me in machine shorthand notes and was thereafter reduced
to typewritten form by me or under my direction and
supervision; that the foregoing transcript is a true and
accurate record of the testimony given to the best of my
understanding and ability.

     In accordance with Rule 30(e) of the Rules of
Civil Procedure, review of the transcript was requested
by the deponent or a party thereto.

     I FURTHER CERTIFY that I am neither counsel for,
related to, nor employed by any of the parties to the
action in which this proceeding was taken; and, further,
that I am not a relative or employee of any attorney or
counsel employed by the parties hereto, nor financially
interested, or otherwise, in the outcome of this action;
and that I have no contract with the parties, attorneys,
or persons with an interest in the action that affects
or has a substantial tendency to affect impartiality,
that requires me to relinquish control of an original
deposition transcript or copies of the transcript before
it is certified and delivered to the custodial attorney,
or that requires me to provide any service not made
available to all parties to the action.
     GIVEN UNDER MY HAND and SEAL OF OFFICE on this
27th day of April, 2014.


     _____
     Jeff Bennett, CCR, LS No. 19, Notary
     Public in and for Saline County, Arkansas
My Commission expires November 29, 2020.
```

Page 145

```
 1        ERRATA SHEET OF RUSS RASNIC
 2
 3   PAGE # | LINE # |   ERROR   | CORRECTION & REASON
 4       |    |    |
 5       |    |    |
 6       |    |    |
 7       |    |    |
 8       |    |    |
 9       |    |    |
10       |    |    |
11       |    |    |
12       |    |    |
13       |    |    |
14       |    |    |
15       |    |    |
16       |    |    |
17       |    |    |
18       |    |    |
19       |    |    |
20       |    |    |
21       |    |    |
22       |    |    |
23       |    |    |
24       |    |    |
25       |    |    |
```

Page 147

REPORTER'S CERTIFICATION OF CERTIFIED COPY

1
2
3        I, JEFF BENNETT, LS No. 19, Certified Court
4   Reporter in the State of Arkansas, certify that the
5   foregoing pages 1 through 143 constitute a true and
6   correct copy of the original deposition of RUSS RASNIC
7   taken on April 15, 2012.
8        I declare under penalty of perjury under the laws
9   of the State of Arkansas that the foregoing is true and
10  correct.
11       Dated this 27th day of April, 2014.
12
13       _____
14       Jeff Bennett, CCR, LS No. 19, Notary
         Public in and for Saline County, Arkansas
15  My Commission expires November 29, 2020.
16
17
18
19
20
21
22
23
24
25

Page 146

```
 1        WITNESS SIGNATURE PAGE
 2
 3        I, RUSS RASNIC, the witness, hereby certify that I
 4   have thoroughly read the transcript of my deposition
 5   taken on the 15th day of April, 2014, and have made any
 6   necessary changes or corrections to make the transcript
 7   a true and accurate accounting of my testimony given on
 8   that day.
 9
10
11             Signature
12
              Date
13
     *******************************
14
     STATE OF          *
15                     * ss.
     COUNTY OF         *
16
17       SUBSCRIBED AND SWORN TO before me, a Notary Public
18   in and for          County,          .
19   Given under my hand and seal of office on this     day
20   of        , 2014.
21
22
23
24   My commission expires              .
25
```